THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RALPH HROBOWSKI, Defendant-Appellant.

Second District   No. 2—89—0299

Opinion filed July 19, 1991.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

The defendant, Ralph Hrobowski, was charged by indictment with four counts of first-degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)) in connection with the stabbing death of Sharon Myrick. A jury found the defendant guilty of first-degree murder, and the court sentenced defendant to a term of 50 years' imprisonment. The court then denied defendant's motion for a new trial, and defendant filed his notice of appeal. We affirm.

On appeal, defendant contends that his conviction of murder should be reversed and the cause remanded for a new trial for the following reasons: (1) defendant was denied the effective assistance of counsel; (2) defendant was denied a fair trial due to various instances of prosecutorial misconduct at trial and during closing argument; and (3) the Illinois second-degree murder statute is unconstitutional.

Prior to trial, defendant alleged that he acted in self-defense against Myrick who, according to defendant, had injected cocaine and heroin, then attacked defendant with a knife, calling him by the name "Red." In its answer to discovery, the State furnished the defense with a copy of a laboratory report showing cocaine in Myrick's blood. The State also furnished to defendant a sample of Myrick's blood for independent analysis. Because the first sample sent by the State was improperly packaged, the blood turned rancid and could not be evaluated. A second sample was delivered and test results for the presence of heroin were negative. Defense counsel informed the State and the court that the blood was tested only for the presence of heroin and

that the defense would rely on the State's test results to prove the presence of cocaine.

Also prior to trial, the State moved to exclude any evidence of drugs in Myrick's blood. In support of the motion, the State argued that the defense's expert, Dr. Jawed Fareed, was only a pharmacologist who was incapable of testifying to the behavioral effects of drugs on the victim. Further, the State argued that the test results showing the presence of cocaine could not be admitted as substantive evidence unless the defense subpoenaed the laboratory technicians who performed the test or unless the defense tested the blood itself. The court ruled that the test results could only come in as data that an expert relied upon in formulating his opinion, unless defense counsel presented testimony from a witness who had personally tested the blood for cocaine. Defense counsel expressed his intent to have Dr. Fareed test the blood for the presence of cocaine, and the court allowed counsel to seek a second test. The court then barred defense counsel from referring to any expert testimony regarding the presence of cocaine in the deceased's blood in his opening statement but allowed counsel to tell the jury that defendant would testify that the victim injected drugs prior to her death, resulting in strange and violent behavior.

Also barred from counsel's opening statement was any reference to Anthony Allen, a potential defense witness. According to the defense, Allen was twice stabbed by the deceased and was going to be subpoenaed to testify. However, Allen had indicated that he would not honor a subpoena and had threatened defense counsel. Therefore, defense counsel delayed the service of the subpoena until midway through the trial. Because Allen's appearance as a witness was uncertain, the court barred defense counsel from outlining Allen's testimony in the opening statement. The case then proceeded to trial.

Dana Myrick, the deceased's eight-year-old son, testified that the defendant was at his house on September 8, 1988. Earlier in the evening of September 8, defendant stayed home with Dana while his mother and sister, Amber, went to the Park-It-Market to buy wine and beer. When Dana went upstairs to take a shower, defendant came up for soap and a washcloth. Dana noticed defendant's pinkie finger was bandaged. After his mother returned from the store, Dana worked on a drawing in the kitchen and then went to bed. Dana awoke later when he heard his mother calling him for help. When he ran downstairs, he saw defendant hitting his mother in the chest while she scratched him. Dana ran across the street to Jewel Garth's house and told Garth to call the police. Dana then stood outside

Garth's house watching his own house. Dana saw the defendant run out of the house with blood on his shirt and pants. Defendant slipped in the parking lot and ran away. Dana described the defendant's shoes as "violet red." Later, the police arrived and a crowd gathered outside the house. While Dana's grandfather was holding him, Dana saw defendant in the crowd and identified him as the man who had hurt his mother. Defendant had slicked his hair back, put on clean clothes and no longer had a goatee beard.

Beverly Garth, Jewel Garth's 16-year-old daughter, testified that she was with Dana when defendant ran out of the house. According to Garth, defendant was wearing a T-shirt with blood on it and was shaking his hands like he had something on them. Garth recognized defendant because he had been to her house to see a friend who was living with Garth in December 1987. Before Garth saw defendant run out the door, she saw Renee Williams at Myrick's apartment calling Myrick's name. Williams ran away just before defendant ran out.

Renee Williams testified that she went to Myrick's apartment after she heard Myrick saying, "Dana help me; Dana go get help." Williams was in the basement of her mother's apartment, which shared a wall with Myrick's apartment. Williams had gone into the basement to do laundry, but had not started the machines yet. After hearing Myrick scream, Williams ran over to Myrick's door and called her name twice. When she saw a man coming up from the basement, she ran back to her mother's house. Williams heard only one voice screaming and calling Dana for help.

Willie Earl Fisher testified that on September 8, 1988, between 10:30 and 11 p.m., defendant came to his house and rang his doorbell. Defendant had blood on his pants and was not wearing a shirt. Defendant told Fisher somebody had broken his nose and he needed to take a shower. When defendant took off his pants a knife fell out of the back pocket. After he washed, defendant asked for clothes to wear. Fisher stated that he thought defendant had a beard when he arrived at his house, but he did not have one when he left. Fisher saw the defendant shower but did not see him shave.

Willie Glover was drinking on the porch at Horace Holliman's house between 10 and 11 p.m. when defendant walked up and asked for a bandage, saying that he had cut his hand. Glover did not have one, but gave the defendant a cigarette. Defendant then left. About 20 minutes later, Glover heard sirens and someone told him that Myrick had been killed. Glover went over to Myrick's house, where a crowd had gathered.

News photographer Dennis Lingbeck worked for WTVO channel 17 in Rockford. Around 30 to 45 minutes after arriving at the scene, Lingbeck heard Dana identify the defendant as the man who had hurt his mother. Lingbeck turned his camera on and filmed the defendant as he was arrested. This video tape was played to the jury, with the audio portion of the defendant's statement omitted, the trial court having earlier ruled that defendant's statement was recorded without his knowledge. The court allowed Lingbeck to testify to defendant's statement as he heard it, which was, "I was here earlier but geez."

Rockford Detective John Vaughn was the second officer to arrive at the scene. Vaughn entered the house through the front door when he saw Myrick at the bottom of the basement stairs. Myrick was dead at that time and had lacerations in the throat and face. Vaughn photographed the scene and was then called outside to photograph a suspect that was in custody, the defendant. Vaughn stated that defendant seemed calm and humorous, not excited. Eighteen items were recovered in the apartment, including defendant's jean jacket, briefcase with defendant's diploma from the University of Illinois, a manila folder and a Bible. Myrick's daughter was discovered sleeping upstairs and was taken out by police.

Officer John Genens made a video tape of the scene which was played to the jury. Genens also photographed the defendant and collected certain items as evidence, including defendant's shoes, headhair combings and dried blood from the defendant's nose, right eye and ears.

Officer Howard Forrester, who interviewed defendant, stated that the dried blood did not correspond to any cuts on the defendant. Defendant did have scrapes on both elbows, scratches on his left hand, left forearm and left cheek, and a cut inside his left ring finger. Defendant also had a sutured cut on his left little finger which appeared healed. Underneath his chin, defendant had several long hairs, and his chin was chafed. According to Forrester, defendant told him that he went to Myrick's house around 9 or 9:30 p.m. on September 8. They shared a marijuana cigarette and went to the Park-It-Market where they bought two bottles of wine and cigarettes. Defendant stated that Myrick drank all of one and part of the second bottle of wine. Myrick and her daughter then went to the market again while defendant stayed with her son and helped him with his homework. Defendant told Myrick that he was separated from his wife and had no place to stay. Defendant told Forrester that Myrick offered to let him stay at her house, but a black man came to the door, who defendant assumed was Myrick's boyfriend, so he left. Defendant returned

to the Park-It-Market and got into a fight, where he received the above-referenced scratches. A half hour later, defendant returned to the apartment, and Dana accused him of being the man who hurt his mother. Forrester further testified that defendant stated that he did not argue with Myrick and that she was not injured when he left. Defendant said that he was wearing the same clothes as when he left Myrick's apartment. When Forrester asked defendant why Dana and others said they saw defendant run out of the apartment with blood on him, defendant repeated that it was not him. Defendant stated that he was sober and he appeared calm and cooperative.

Later, Detective Anthony Piccirilli asked defendant to consent to the withdrawal of a blood sample. Defendant initially agreed, but then tore the consent form and jumped up, balling his hands into fists. Forrester and Piccirilli then handcuffed defendant to a chair and placed him into a holding cell. The handcuffs were later removed when defendant appeared calm.

Hyun Jun, the owner of the Park-It-Market, and his niece, Hae Jun, were both working at the market on the evening of September 8. They testified that there were no fights in the store or in the parking lot that night.

Dr. Lawrence Blum, a forensic pathologist, testified that Myrick died as a result of hemorrhagic shock due to the loss of blood caused by incised wounds or cuts of both jugular veins. Dr. Blum further determined that a contributing cause of death was a stab wound to the right lung. Dr. Blum identified 47 separate stab wounds on Myrick's body but said that some wounds ran together and could not be counted. Dr. Blum also explained that various wounds to Myrick's arms and hands constituted defensive wounds, which are wounds that would be incurred while a victim was trying to ward off attack. Dr. Blum stated that a person of Myrick's height and weight probably has 2½ to 3 liters of blood. When defense counsel asked Dr. Blum if he drained the blood from the body to measure it, Assistant State's Attorney Joseph McGraw allegedly stated, "the defendant did it." Defense counsel requested a hearing in chambers, where the trial judge stated for the record that he had not heard the comment. As the State correctly notes, it would also appear that the court reporter failed to hear the comment, because it is not reflected in the transcript. Defense counsel moved for a mistrial based on the comment, arguing that it would prejudice the jury. The trial judge denied the motion, stating that he would not assume that the jury had heard a comment which he had not heard. The court then admonished the jury to disregard any comments from counsel not directed to the witness.

On cross-examination, Dr. Blum also stated that, according to a toxicology report, Myrick had 417 nanograms of cocaine in her blood at the time of death. Myrick also had 2,500 nanograms of benzoylecgonine, which is the chemical cocaine breaks down into in the body. Dr. Blum concluded that Myrick did not die from cocaine overdose and stated that he did not know the relationship between the level of benzoylecgonine and the amount of cocaine that Myrick originally ingested. Dr. Blum could not relate the behavioral effects of cocaine on Myrick, since he was not a psychiatrist. Dr. Blum did find needle tracks on Myrick's arms and testified that injection is the most potent method of ingesting drugs.

Other forensic experts testified as to the results of blood, shoe and fingerprint examinations performed in the case. Patrick Powers testified that he could not conclude that the shoe impressions on the kitchen floor at the scene came from defendant's shoes. A hand railing was seized from the apartment because a palm print was found formed in blood. Patricia Powers testified in this regard and concluded that defendant's left palm print matched the palm print on the bannister, with 17 points of identity. Myrick's blood was identified on two knives, the railing, and defendant's shoes, shirt, T-shirt and head-hair combings. Defendant's blood was not found on these items but was found on the clothing he was wearing when he was arrested. Defendant's shirt and T-shirt were found, along with a knife, underneath a pine tree a few blocks from Myrick's apartment.

Defendant testified in his own behalf. Defendant was 35 years old at the time of the incident and had graduated from the University of Illinois with a bachelor's degree and from Chicago State University with a master's degree in corrections and criminology. While finishing his master's degree in 1978, defendant got a job with the Department of Corrections and, after graduation, became a parole agent, until 1985. Defendant was convicted of aggravated battery in August 1988.

On September 8, 1988, defendant picked up a job application, had lunch and then walked around Rockford. Defendant eventually got a ride to 15th and Seminary and started walking to the house of an acquaintance named Larry. As defendant passed Myrick's house, Myrick came outside. Defendant did not remember her because he had only met her once about one month earlier, when his acquaintance Larry had introduced them. Defendant stopped in at Myrick's for a while, then went to Larry's, but Larry was not home. Myrick told defendant that if he had no place to stay he could stay at her house that night. Later, defendant returned to Larry's, but when he still was not home, defendant returned to Myrick's. It was about 6:30 or 7 p.m., and

Dana and Amber were sitting at the kitchen table. Dana was doing homework. Defendant sat in the living room with Myrick and showed her his diploma. Myrick then started mixing a substance in a wine cap that she said was cocaine. Myrick drew the substance into a syringe and started to inject it into her arm when Dana came into the living room. Myrick turned her back when defendant told her that Dana was coming, and he distracted Dana by asking about a drawing Dana had made. Defendant again returned to Larry's, but he still was not home. Defendant then sat across the street in front of a drugstore for a while.

When defendant returned to Myrick's around 8:45 p.m., he asked her if he could take a shower and shave for his interview the next day. Defendant started to shave, but never finished because he went back downstairs to give Dana, who was in the bathtub, some privacy. Defendant and Myrick then went to the store and bought a pint bottle of wine and a pack of cigarettes. Myrick asked defendant to pay for another bottle of wine, which he did because she was putting him up for the night.

When Myrick returned from the store, the children went to bed. At that time, according to defendant, a black man knocked on the door. Defendant then walked to the store, and when he returned, the man was gone. A half hour after his return, Myrick told defendant that she was going to do a speedball, meaning a mixture of heroin and cocaine. Myrick put three packets of drugs into a bottle top and cooked it with a lighter. After she injected herself, Myrick began to hold her heart and breath heavily. Defendant started to leave, but felt responsible for Myrick, so he stayed. Myrick jumped up from the couch abruptly, opened drawers in the kitchen, and then returned to the couch with her hands behind her back. At that point, Myrick started calling defendant "Red," saying, "Red, I am going to kill you." Myrick then lunged at defendant and stabbed him on the arm with a knife. When defendant tried to grab Myrick's hand, he got cut on his two right middle fingers. Defendant got behind Myrick, picked her up and slammed her down on the couch. Myrick was bleeding at that point either from her throat, ear or shoulder. Defendant tried to get out the door, but Myrick chased him with the knife in her hand. Defendant kept picking Myrick up and falling with her to the ground, trying to knock the wind out of her and telling her he was Ralph, not "Red."

Defendant got the knife away from Myrick and tried to get out the door, but the screen door was locked, and he could not find the latch. Myrick then ran to the kitchen for another knife and attacked

him again. Defendant stabbed Myrick on her arm, her neck and her face, stating that he was trying to cut Myrick everywhere that he could where there would not be serious damage. According to defendant, he stabbed Myrick about 25 times. Defendant stated that he could not take it anymore, so he threw his knife down, picked Myrick up and slammed her down as hard as he could. Defendant tried to carry Myrick to the door to get out, but they were both covered in blood. Defendant slammed Myrick against the bannister and yelled to Dana to get help. Defendant hit Myrick with his fists, and they scuffled on the floor. Defendant saw Dana run out the door. While scuffling, both defendant and Myrick then fell over the bannister. Myrick grabbed defendant's leg and pulled him down the stairs. Defendant grabbed one of the knives lying on the stairs and started slashing at Myrick to get away. Defendant then put the knife in his pocket and ran out the door. Defendant took off his shirt and T-shirt while running and finally ended up at Willie Fisher's house. According to defendant, he told Fisher that he got into a fight with Myrick and might have hurt her. Defendant then wet a towel and washed. Defendant stayed at Fisher's for 30 to 45 minutes in a state of shock and then told Fisher he had to return to Myrick's apartment to see if she was alright. As soon as defendant got there Dana identified him, and he was arrested. Defendant also stated that he spoke to the police because he wanted to be cooperative, but that he did not tell them about his fight with Myrick because, in his experiences as a parole agent, he knew it was better to have an attorney present.

On cross-examination, defendant stated that he asked for an attorney after he signed a *Miranda* warning form but was not provided one. The police did not tell defendant why he was under arrest. Defendant acknowledged telling the police about the other man who came to Myrick's apartment, but said he did not tell them that he returned to the apartment or that Myrick attacked him that night, because he wanted counsel present so that none of his statements would be misunderstood. Defendant denied telling Detective Forrester that he had worn the same clothes all night. Rather, defendant had refused to answer that question. Defendant did not tell the police that he was in a fight with a white man at the Park-It-Market that night. Although defendant refused to sign the consent form for the withdrawal of a blood sample, because he believed consent was not required, defendant said that the police tore up the form, not him. Defendant jumped up and balled his hands into fists when Officer Piccirilli slapped him. Defendant also repeated that he, not Myrick, had called to Dana for help. Defendant said that Myrick never called out for

help. Defendant stated that he did not know why, but that Renee Williams lied when she said that she heard Myrick call out for help. According to defendant, Willie Glover also lied when he said that defendant asked him for a bandage, although defendant did sustain a stab wound on his arm, cuts on two fingers, a bloody nose and several scratches. Defendant stated that he returned to the apartment not to retrieve his belongings, but to see if Myrick was alright. Defendant did not phone police or an ambulance and said that he was not thinking clearly at that time. Defendant denied laughing or joking with the police when he was arrested and stated that Forrester neither took notes during his interview with defendant nor asked him to make a written statement.

On redirect examination, defendant testified that he did not intend to kill Myrick or cause her great bodily harm. Neither did defendant know that Myrick could die from her wounds. Defendant's intent was to get out of the apartment and away from Myrick.

After defendant's testimony, the defense called Anthony Allen. When the bailiff informed the court that Allen was not present, the trial was continued over the weekend. Over the weekend, the record showed that sheriff's police had attempted to execute an arrest warrant on Allen, but that Allen had eluded police. Defense counsel asked for a continuance to obtain Allen's presence, a mistrial, or a stipulation as to what his testimony would be. According to defense counsel, Allen was Myrick's fiance and had been stabbed by Myrick more than once in the past. Defense counsel had an accident report which showed that Myrick had stabbed Allen. Since Allen had been seen in the last 24 hours, counsel argued that he was not unavailable as a witness. In response, the State argued that the failure to produce Allen as a witness would be harmless, since the court records showed that Myrick stabbed Allen in self-defense. The State added that Allen had no intention of cooperating with the defense, or submitting to process. The court concluded that all reasonable steps had been taken to secure Allen as a witness and, questioning the relevance of Allen's testimony, refused to delay the trial or declare a mistrial. The State then asked defense counsel if he intended to call Dr. Fareed, the pharmacologist. Defense counsel stated that he had no other witnesses. After returning to open court, defense counsel again called Anthony Allen to the stand, but to no avail. After defense counsel again stated that he would not be calling any other witnesses, the court announced that the defense had rested.

The State then proceeded to call five witnesses in rebuttal. Officer Genens stated that he did not tell the defendant how to stand or look

when he photographed the defendant. Genens added that the defendant was jovial and carefree at the scene. Before cross-examining Genens, defense counsel stated that he still had a witness that he wanted to call but that the court was forcing him to proceed. Stating that he did not have any questions, defense counsel said the defendant wanted to question the rebuttal witnesses. In chambers, defense counsel notified the court that he would ask questions that the defendant wrote out for him. Officers Vaughn and Barton testified that the door to Myrick's apartment which faced west was unlocked when they arrived on the scene. Officer Barton stated that he had no trouble opening the door and no one arrived before he did. Officer Forrester testified that he did not fabricate any part of the interview with defendant on September 9. Defendant never demanded an attorney and was told that he was a murder suspect before the interview began. Officer Piccirilli denied that he tore up the consent form for the taking of a blood sample. Once the State rested, defense counsel again called Anthony Allen as a witness, but the bailiff again stated that he had not appeared. The court then closed the proofs.

Defense counsel presented two closing arguments to the jury. First, counsel read the defendant's written argument. In it, defendant detailed inconsistencies in the State's witnesses' testimony. In discussing Dr. Blum's testimony, counsel informed the jury that Myrick had a .417 level of cocaine in her body when she died, which is 10 times the normal amount. Counsel concluded this portion of closing argument by stating that defendant was not guilty of first-degree murder or second-degree murder, but rather had acted out of self-preservation.

Defense counsel, in his own closing argument, went on to discuss in some detail the facts of the case. Counsel also stated, *inter alia,* the following:

"Like I said, I have an [*sic*] disagreement with my client. You know, I will tell you right now I think that he thinks he is not guilty of anything. They think he is guilty of first-degree murder. I think he is guilty of second-degree murder.

* * *

It seems to me when you review this evidence—I know you heard Ralph, and I think he is believable in terms of saying that he thought that he was defending himself. He thinks—I think his testimony was he was acting completely in self-defense. He felt that he had no alternative. He felt that—she had gotten one knife. He had taken away. She had gotten another knife. He thought that he was in mortal danger. I think in re-

viewing this evidence you could easily decide that he was not in mortal danger.

That's different than saying that first of all, he was unreasonable in deciding that he was in mortal danger or that he never even thought that he was in real danger. The difference is this: If he thought that he was in real danger and that was a reasonable belief, then he is not guilty of anything and you should find him not guilty.

If he thought that he was in danger but that was not reasonable, that was out of line with the situation as it was occurring, then he is guilty of second-degree murder.

\* \* \*

In this case it seems to me that if they proved murder, what they have proved is second-degree murder, and any other verdict would have to be based solely on anger or a sense of boy, look at all of this blood, some sense of sympathy or anger, and that's not what the case is supposed to be decided on. It's supposed to be decided on facts and evidence and where things lie.

If you look at the pictures and try to make sense of how it happened and where it happened, it seems to me that there cannot be a verdict of first-degree murder in this case."

In rebuttal argument, the State argued that this was not a second-degree murder case and asserted that the jury would have to believe that all of the other witnesses were lying who contradicted the defendant in order to find the defendant guilty of second-degree murder. In this regard, the assistant State's Attorney stated:

"Somehow for some unknown reason everybody got together in the greatest conspiracy since the Kennedy assignation [sic] and put all of these intricate pieces of evidence together that just fit so well, and those are all lies and the defendant alone is just a poor victim of circumstance who told the truth."

The State also addressed defendant's claim that Myrick was the aggressor and had attacked defendant and chased him throughout the apartment. The State argued:

"Don't forget his conviction, Ladies and Gentlemen, for aggravated battery in determining whether or not you want to believe that Sharon Myrick was some kind of homicidal maniac pursuing him relentlessly from room to room of the house.

I don't know if you remember it or not, but a few years ago there was a movie out called the 'Terminator.' I don't know if any of you saw it. It starred Arnold Schwarzenegger, and what was interesting about it was he was a robot from the future

who came back to the present to kill someone, and he looked human, but in fact he was a robot underneath, and what made him so terrifying was that he was relentless. No human weaponry could stop him, and he pursued his prey no matter what efforts were taken to disable him, he came on and he came on, and there was the terror of that movie.

This guy over here, Mr. College Wrestler, Mr. Six One, 160 pounds wants you to believe that Sharon Myrick was that terminator. There is a terminator all right, and he is sitting right there, and he is wearing a blue suit and a red tie."

In response to defendant's argument that a motive for first-degree murder did not exist, the State argued that the jury did not have to find a motive to convict defendant. Stating that there were still questions unanswered in this case, the State argued, "Sharon Myrick is not here to be with you to say [sic] today. That pretty face and neck forever silenced. That mouth shut forever." The court overruled defendant's objection that the State was appealing to the jury for sympathy. The State also argued that if the jury was going to believe anything that defendant said, it had to believe it all. An objection was overruled, and the State continued as follows:

"He is a liar through and through. The evidence contradicts him. You don't have to take my word for it.

You know, I really think that this is a case about three people. It's about Sharon Myrick, it's about the defendant, and about Dana. Do you remember Dana? You know, that was a pretty courageous little eight-year-old boy that came into this courtroom and had to testify about something that would be horrible for an adult to recall.

Many of us—most of us probably in our lifetime will probably never encounter anything that even remotely approaches something of that magnitude, and he stood up here like a courageous little boy, and he took the oath to tell the truth, and he answered all the questions I put to him and he answered all the questions Mr. Spiezer put to him for an hour and a half. Did you have a book bag, and on and on about the details of that night, and that little boy was the most candid, forthright person. You could see it in his face. There was not an ounce guile [sic] in his bones. He is just a truth telling little boy.

You know, sometimes out of the mouth of babes the truth comes, and it came. It was undeniable. There is just too many questions, Ladies and Gentlemen. Too, many questions that don't add up."

At the close of rebuttal argument, the assistant State's Attorney stated:

> "You know, the defendant could not give me a straight answer on cross-examination. \*\*\* He wouldn't know the truth if it ran him over. \*\*\*
>
> If you believe that he defended himself, give him back his violent [*sic*] purple shoes and let him tap dance out of the courtroom, and maybe you should give him the knives to take with him in case he has to defend himself again some other day.
>
> Provocation? Nonsense. Self-defense? That's ridiculous. It's murder. Call a spade a spade. This is murder. No beating about the bush."

The jury in this case subsequently returned a verdict finding defendant guilty of first-degree murder. After hearing evidence and arguments in aggravation and mitigation, the court sentenced defendant to a 50-year term of imprisonment. Defendant's motions for a new trial and to reconsider the sentence were denied.

■ Defendant's first contention on appeal is that he was denied the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) To show actual prejudice, defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Scrutiny of trial counsel's performance must be highly deferential, and there is a strong presumption that counsel's conduct is within the wide range of reasonable professional assistance. (*People v. Johnson* (1989), 128 Ill. 2d 253, 266.) Thus, judicial inquiry into the competency of counsel will not generally extend to the exercise of judgment, discretion, trial tactics or strategy, even where appellate counsel or a reviewing court might have handled the matter differently. (*People v. Barfield* (1989), 187 Ill. App. 3d 190, 197.) Moreover, defendant may not rely on mere conjecture or speculation that the outcome would have been different with representation of a higher caliber. *Barfield*, 187 Ill. App. 3d at 198.

■ Specifically, defendant argues that he was denied the effective assistance of trial counsel for the following reasons: (1) counsel failed to obtain the testimony of Anthony Allen, who, according to defend-

ant, would have testified that his nickname was "Red" and that Myrick had stabbed him on two previous occasions; (2) counsel failed to obtain the testimony of Dr. Jawed Fareed, who, according to defendant, would have testified that the amount of cocaine in Myrick's blood could cause hallucinogenic effects, thus corroborating defendant's account of Myrick's behavior; (3) counsel did not personally provide cross-examination of the State's brief rebuttal testimony, but rather asked questions of the rebuttal witnesses that defendant had submitted; (4) counsel failed to object to allegedly improper and prejudicial comments during closing argument; and (5) counsel presented two, inconsistent closing arguments, conceded defendant's guilt for second-degree murder, and thus diminished defendant's credibility.

Claims of ineffective assistance of counsel may be disposed of on the ground that the defendant suffered no prejudice from the claimed errors, without deciding the first prong of *Strickland*, whether the errors were serious enough to constitute less than reasonably effective assistance. (*People v. Johnson*, 128 Ill. 2d at 271.) Assuming, without deciding, that the above allegations do in fact support a finding of ineffective assistance of counsel, we do not believe to a reasonable probability that the jury would have found defendant not guilty of the first-degree murder charge if counsel had performed differently. Although defendant argues that he acted purely in self-defense, and that counsel's actions served to destroy the theory of the case, the facts of this case and defendant's conduct, both prior to and after his arrest, belie the self-defense argument.

Dr. Lawrence Blum, the forensic pathologist who performed the autopsy on Myrick, testified that Myrick received 47 distinct stab wounds, plus additional wounds which were uncountable because they ran together. Dr. Blum also characterized various wounds to Myrick's arms and hands as defensive wounds, which would have been incurred while trying to ward off attack. In sharp contrast, defendant's only injuries consisted of a cut on the arm, cuts on two fingers and the back of his hand, a bloody nose and a facial scratch. Myrick's eight-year-old son, Dana, testified that he saw defendant hitting his mother and that he saw defendant run out of the house with blood on his shirt and pants. Dana also stated that when defendant returned to the scene, he had slicked his hair back, put on clean clothes and no longer had a goatee beard. Although defendant testified that he called out to Dana for help, Renee Williams testified that she went to Myrick's apartment after she heard Myrick yelling for Dana to get help. Although defendant testified that he told Willie Fisher that he had

fought with Myrick, Fisher testified that defendant told him that somebody had broken his nose and that he needed to take a shower. News photographer Dennis Lingbeck testified that, as defendant was being arrested, he heard defendant say, "I was here earlier but geez." Rockford Detective John Vaughn, who photographed defendant at the scene, testified that defendant seemed calm and humorous and not excited. Officer Howard Forrester, who interviewed defendant, testified that defendant told him that he did not argue with Myrick and that she was not injured when defendant left. Defendant told Forrester that he was wearing the same clothes as when he left Myrick's apartment and that the person Dana and other witnesses saw running out of Myrick's apartment was not him. Although defendant told Officer Forrester that he got into a fight at the Park-It-Market, Hyun Jun, the owner of the Park-It-Market, testified that there were no fights in the store or in the parking lot that night.

The State presented more than enough evidence to prove beyond a reasonable doubt that defendant committed the offense for which he was charged. Thus, even if counsel had performed differently, we are not convinced to a reasonable degree of certainty that the jury would have found otherwise. Moreover, we believe that, on the whole, defense counsel provided zealous and effective representation. At trial, counsel successfully elicited testimony from Dr. Blum indicating that Myrick was a chronic drug user. Regarding the newscast video tape of defendant's arrest, counsel successfully argued that the audio portion of the tape, containing a statement by defendant that tended to impeach his trial testimony, should not be played to the jury. During cross-examination of defendant, counsel's objection to a line of questioning suggesting that defendant used or handled illegal drugs was sustained. At no time did counsel concede defendant's guilt of the crime charged, first-degree murder. Rather, throughout the entire proceeding, including closing argument, counsel vigorously tested and challenged the State's evidence. Accordingly, we conclude that defendant was not prejudiced by trial counsel's representation, and the defendant's argument that he was denied the effective assistance of counsel at trial must therefore fail.

Next, defendant argues that he was denied a fair trial due to various instances of prosecutorial misconduct at trial and during closing argument. Although the State correctly points out that defendant failed to object to a number of the allegedly improper comments, such issues may still be considered on appeal where the failure to object is claimed, as it is here, to result from ineffective assistance of counsel.

(*People v. Emerson* (1987), 122 Ill. 2d 411, 434.) We shall therefore examine defendant's contentions.

■ Prosecutors are generally allowed great latitude in closing arguments, and improper remarks will not merit reversal unless they result in substantial prejudice to defendant. (*People v. Thomas* (1990), 200 Ill. App. 3d 268, 275.) Each case must be decided on its own facts (*People v. James* (1990), 200 Ill. App. 3d 380, 393), and complained-of remarks must be examined in the context of both the State's and the defense's arguments (*People v. Lewis* (1990), 198 Ill. App. 3d 976, 982). The test for determining whether a prosecutor's remarks in closing argument constitute reversible error is whether those comments were such that, without their having been made, the jury might have reached a different result. (*Lewis*, 198 Ill. App. 3d at 982.) An instruction that closing arguments are not evidence and that any statement not based on the evidence should be disregarded tends to cure possible prejudice from improper remarks. (*Thomas*, 200 Ill. App. 3d at 275.) With these principles in mind, we consider defendant's contentions.

■ First, defendant contends that the State made an improper remark during cross-examination of forensic pathologist Dr. Lawrence Blum. As noted previously, after defense counsel asked Dr. Blum if he had drained the blood from the victim's body during the autopsy, the assistant State's Attorney allegedly interjected, "the defendant did it." The State correctly notes that the comment is not reflected in the transcript. Defense counsel requested a hearing in chambers, where the trial judge stated that he had not heard the comment. Nevertheless, the court instructed the jury to disregard any comment it might have heard that was not directed toward the witness. Where a timely objection is made to improper argument, the court can usually correct the error by sustaining the objection or instructing the jury to disregard the remark. (*People v. Thomas* (1990), 200 Ill. App. 3d 268, 275.) Here, defense counsel immediately requested to be heard in chambers. The trial judge stated for the record that he did not hear the complained-of comment and that he would not assume that the jury had heard a comment which he had not heard. Nevertheless, the judge instructed the jury to disregard any remarks it may have heard. It would seem to be pure speculation, at this point, whether the jury actually heard any comment from the State. Thus, we believe that the error, if any, did not rise to the level of reversible error and was in any event cured by the trial court's timely admonishment to the jury.

Second, defendant contends that the State improperly described defendant as "the Terminator," thus injecting the image of an infa-

mous killer in an attempt to inflame the jury and appeal to their fear. We agree with the State that, based on the context of the argument, the complained-of remarks were an appropriate discussion of, and focused on, defendant's theory of self-defense, in that defendant maintained that Myrick pursued him with a knife throughout the apartment. We believe the facts of this case are therefore distinguishable from those in *People v. Barnes* (1982), 107 Ill. App. 3d 262 (prosecutorial reference to John Wayne Gacy in closing argument deemed improper), and *People v. Tiller* (1982), 94 Ill. 2d 303 (prosecutorial reference to Nazi holocaust deemed improper). Rather, we conclude that, considering the context of the language used and its relationship to the evidence, defendant's right to a fair and impartial trial was not affected. *People v. Thompkins* (1988), 121 Ill. 2d 401, 445.

Third, defendant argues that the State improperly appealed to the jurors' sympathy when it told the jury to "[i]magine the terror she felt as she retreated from room to room in her house, and for God only knows why he came at her plunging the knives into her as he went. Sharon Myrick is not here to be with you to say [*sic*] today. That pretty face and neck forever silenced. That mouth shut forever." Viewed in the complete context of the State's argument, we do not believe the above statements were improper. The first statement was a comment on the defendant's theory that it was Myrick, not defendant, who was the aggressor and pursuer. The second statement was a legitimate, if somewhat obvious, reference to the fact that only defendant, not Myrick, could provide answers to some of the questions regarding exactly what happened on the night of September 8, 1988.

Fourth, defendant argues that the following prosecutorial statement was also improper and prejudicial: "What is his story? Make no mistake about it, Ladies and Gentlemen, it is a story. A story of self-defense, and you know what the title of that story is for this defendant? 'Dead Women Tell No Tales.' " Again, we believe that this type of statement amounts to no more than somewhat obvious commentary on the fact that Myrick was not present to contradict defendant's theory of self-defense. The State then went on to summarize the evidence in an attempt to demonstrate that Myrick was in fact the victim, not the aggressor. We cannot say that the above comment constitutes reversible error.

Fifth, defendant contends that the State improperly labeled defendant's self-defense theory as "the greatest conspiracy since the Kennedy assignation [*sic*]." Once again, however, when the above statement is viewed in its correct context, it is clear that the State

was simply attempting to impeach the credibility of defendant's testimony. A prosecutor may argue that a defendant is lying if there is testimony at trial which contradicts defendant. (*People v. Rogers* (1988), 172 Ill. App. 3d 471, 478.) Additionally, we note that defendant made the following statement during cross-examination when asked whether, after his arrest, he immediately told the police that he had acted in self-defense: "I was extremely terrified. If Jack Ruby can get into Dallas police department to kill Oswald, what do think [*sic*] my chances were in that mob? I was totally and categorically petrified." Thus, the State's reference to the Kennedy assassination conspiracy was not totally without explanation.

Sixth, defendant argues that certain comments, referenced earlier in this opinion, regarding the victim's son, Dana, improperly appealed to the jury's sympathy and improperly bolstered Dana's credibility. We disagree. Although an attorney may not interject his *personal* belief in the veracity of a witness' testimony, witness credibility is a proper subject of comment in closing argument. (*Rogers*, 172 Ill. App. 3d at 477.) Comments on the strength of the evidence are also permitted. (*People v. Emerson* (1987), 122 Ill. 2d 411, 434.) We believe that the complained-of remarks were either fair comments on the evidence or, viewed in context, did not amount to personal opinions regarding the strength of the State's case, but rather sought to emphasize the favorable impression created by Dana's demeanor during his testimony. As such, the statements were not improper. *Emerson*, 122 Ill. 2d at 434-35.

Seventh, defendant contends that the following statements were improper and prejudicial:

"If you believe that he defended himself, give him back his violent [*sic*] purple shoes and let him tap dance out of the courtroom, and maybe you should give him the knives to take with him in case he has to defend himself again some other day.

Provocation? Nonsense. Self-defense? That's ridiculous. It's murder. Call a spade a spade. This is murder. No beating about the bush."

Defendant maintains that the above statements constitute an improper attempt by the State to inject both fear and racial prejudice into the proceedings. We disagree and conclude that the State's remarks constitute, in the first instance, a legitimate commentary on the evidence and defendant's credibility. Thus, the facts of this case are distinguishable from those present in *People v. Lyles* (1985), 106 Ill. 2d 373, cited by defendant, wherein the court stated that it was not a proper function of the prosecutor to speculate, during the sen-

tencing hearing, as to what might occur if an accused was not sentenced to death. (*Lyles*, 106 Ill. 2d at 410.) In the second instance, viewed in context, the remarks are clearly aimed at defendant's credibility and do not constitute racial slurs. Defendant argues that the State is in effect calling defendant, who is black, a "spade." This accusation wholly misrepresents the reasonable inferences to be drawn from the above statement. It is readily evident that when the State asks the jury to "[c]all a spade a spade," it is saying, in effect, "call murder 'murder'. Do not call murder 'provocation' or 'self-defense.' " Thus, this case is also factually distinguishable from *People v. Sales* (1986), 151 Ill. App. 3d 226, cited by defendant, wherein the court determined that the prosecutors' improper use of race, the victim's sexual history, and the homosexuality of one of the defendants deprived defendants in that case of a fair trial. *Sales*, 151 Ill. App. 3d at 233.

We conclude that the complained-of remarks did not operate to deny defendant a fair trial. And while we do not ever condone the use of any derogatory references or improper remarks, we do not find reversible error based upon any of the State's comments in this case. (*Lewis*, 198 Ill. App. 3d at 983.) Even if any of the statements of which defendant complains amounted to error, we believe that error was sufficiently inconspicuous and insignificant and could in no way have constituted a material factor in defendant's conviction, without which the jury might have reached a different result. (*Thompkins*, 121 Ill. 2d at 445.) Moreover, the jury was admonished that the statements of counsel were not evidence. We conclude, therefore, that the State's remarks, both individually and cumulatively, did not deny defendant a fair trial.

■ Defendant's final argument on appeal is that the Illinois second-degree murder statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—2) is unconstitutional in that it impermissibly places the burden of proof upon defendant to prove mitigating factors sufficient to reduce first-degree murder to second-degree murder. Defendant recognizes this court's holding to the contrary in *People v. Jerome* (1990), 206 Ill. App. 3d 428, and asks that we reconsider our holding in *Jerome*. The recently enacted second-degree murder statute provides in pertinent part as follows:

> "§9—2. Second Degree Murder. (a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:
> ***

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

\* \* \*

(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code." Ill. Rev. Stat. 1987, ch. 38, par. 9—2.

Specifically, defendant argues that the second-degree murder statute impermissibly requires defendant to prove an affirmative defense or mitigating factors which are inconsistent with, and would negate, an element of the offense of first-degree murder. The defendant in *Jerome* proposed an identical challenge to the constitutionality of section 9—2. In rejecting the defendant's argument, this court stated as follows:

"There is, however, no inherent inconsistency between the mental states for first- and second-degree murder.

When a defendant is charged with first-degree murder, the State is required to prove death, causation and intent (or knowledge). (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a).) The defendant then has the opportunity to prove provocation or unreasonable belief in justification to reduce the offense to second-degree murder. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a).) The existence of provocation or an unreasonable belief in justification, however, will not diminish or negate any of the proved elements of first-degree murder. The mitigating factor is a separate issue the existence of which the State is willing to recognize as a circumstance affecting the degree of culpability or the severity of punishment." *Jerome*, 206 Ill. App. 3d at 436.

Defendant offers no guidance as to why the reasoning set forth in *Jerome* is unsound; he simply asks that we reconsider our decision in that case. We decline to do so. Rather, we conclude that the Illinois second-degree murder statute does not violate defendant's due pro-

cess rights. *Jerome*, 206 Ill. App. 3d at 436; see also *People v. Buckner* (1990), 203 Ill. App. 3d 525, 534 (second-degree murder statute does not violate due process clause of the United States Constitution); see also O'Neill, *An Analysis of Illinois' New Offense of Second Degree Murder*, 20 J. Marshall L. Rev. 209 (1986) (it is clearly constitutional to require the defendant to produce sufficient evidence of mitigation to reduce a charge of murder from first degree to second degree).

For all of the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

DUNN and INGLIS, JJ., concur.