THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KURT POTTHAST, Defendant-Appellant.

First District (4th Division)   No. 1—88—1777

Opinion filed September 12, 1991.

Michael J. Pelletier and Marc Davidson, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Walter P. Hehner, and Solita L. Pandit, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant and his codefendant, Thomas Michael Harris, were tried simultaneously before two juries. Following trial, defendant was convicted of two counts of delivery of a controlled substance and sentenced to concurrent terms of six years' imprisonment. On appeal, defendant contends that he was denied his constitutional right to effective assistance of counsel.

The evidence adduced at trial is as follows. Officer Daniel Byron of the North Eastern Metropolitan Enforcement Group (MEG) testified that on May 7, 1986, he received a telephone call from a man named Nick, whose casual acquaintance Byron had made while working as a police officer in Des Plaines, Illinois. Nick told Byron that he had arranged to introduce another person to a man named Kurt that afternoon at a specified Wendy's restaurant. Nick advised Byron that Kurt would be driving a white Corvette, and that the purpose of the meeting was the purchase by Nick's companion of one-eighth ounce, an "8-ball," of cocaine from Kurt. Nick told Byron that neither he nor the other person would be going to the meeting, and that Byron could do whatever he wanted with the information. Byron met with other MEG officers to discuss Nick's call, arrange an undercover surveillance of the meeting and obtain $275 of MEG funds with which to make the cocaine purchase.

Shortly after Byron and his partner, Officer Steven Livas, arrived at the Wendy's, a white Corvette with two occupants entered the restaurant lot. The officers approached the car and asked the driver if he was Kurt, to which the driver, identified in court as defendant, responded that he was. Livas introduced himself as Nick and Byron as his partner, Dan. Defendant introduced his companion, identified in court as Harris, as his brother Mike. After a brief, general conversation, Livas asked defendant if he had the package, whereupon Harris removed a Newport cigarette box from between his legs and handed it to defendant, who in turn handed it to Livas. Livas looked inside the box, in which there was a clear plastic bag containing a white powdery substance. Livas told defendant that if the sample of cocaine was good, he and Dan would be interested in buying 8 to 10 ounces on a weekly basis. Defendant stated that that would not be a problem. While Livas returned to the MEG car to test the substance for cocaine, Byron remained next to the Corvette conversing with defendant and Harris. Livas returned to the Corvette and told defendant that the cocaine looked good and that they were interested in buying 8 to 10 ounces early the next week. Defendant repeated that there would be no problem except that he needed one day's notice to make a purchase of that quantity. The officers remarked on the quality and condition of the Corvette. Defendant responded that selling cocaine and being careful in doing so allowed one to drive cars of the Corvette's quality. Byron said that he liked doing business with people who were reliable and careful; and defendant replied that, like a retail business, a lot of money could be made selling cocaine by having a good product and being reliable. When Byron asked defendant how they could contact him, defendant gave Byron the telephone number of his electronic pager. Byron told defendant that he would contact him in the early part of the following week, gave defendant the $275 of agency funds, and left.

The following Monday, May 12, 1986, Byron called defendant on his pager number and told defendant that he wanted to purchase 8 to 10 ounces of cocaine. Defendant suggested a meeting beforehand to discuss the details of the transaction. At approximately 9:30 p.m. on May 13, 1986, Byron met defendant and Harris at Garbo's bar. Defendant told Byron that everything was ready and informed Byron of the price per ounce of cocaine, which Byron agreed to pay. Defendant advised Byron that Harris would meet him at a specified Wendy's restaurant the next day and take him to the location

where he, defendant, would be working to conduct the cocaine transaction.

On May 14, 1986, Byron and Livas met with other MEG officers to arrange a surveillance of Byron's meeting with defendant. They also withdrew $5,100 of MEG funds from which they had copied the serial numbers. When Byron met Harris, he told Harris that he would follow him in his own car because once he had the cocaine, he had to leave town in a hurry. Upon arriving at a residence on Normandy Avenue, Harris led Byron to a garage in the backyard. When Byron entered the garage, he saw a brown paper bag on top of a stack of car parts. Defendant handed him the bag, which contained a clear plastic bag inside of which were three smaller plastic bags containing white powder. Byron and defendant left the cocaine in the garage and walked out front to Byron's car where he had left the money. When they returned to the garage, they exchanged the cocaine and money. As defendant was counting the money into Harris' hands, Byron activated an arrest signal. Livas and the other officers on surveillance then entered the garage and placed defendant and Harris under arrest.

On cross-examination, Byron stated that when Nick called, he asked him what his connection was with Kurt and what motivation he had for calling concerning the drug transaction, but Nick would not tell him. Byron denied that Nick had previously informed him of drug deals or that Nick asked for or received anything in return for the information. He stated that he discussed Nick's call with the other MEG officers, but acknowledged that he made no mention of Nick or Nick's telephone call in his MEG report, to the assistant State's Attorneys or in his prior testimony before the grand jury or at the preliminary hearing.

Officer Livas' testimony was substantially the same as Byron's concerning the first drug transaction at Wendy's and the events he observed from his surveillance position outside the garage where the second transaction occurred. On cross-examination, Livas stated that information concerning drug deals comes from various sources, including "people who are looking to work off a beef," *i.e.*, people who have been arrested and agree to provide information about other crimes in exchange for a sentence of probation rather than imprisonment, but that in this case the information came from an anonymous caller. He did not know anyone named Venegas or Keleman. A computer check of the license plates on the Corvette revealed that the plates were registered in defendant's name, but to a

car other than the Corvette. Livas never learned who owned the Corvette.

It was stipulated that the Newport cigarette box contained 3.5 grams of cocaine and that the three bags recovered from the garage contained 83.3 grams of cocaine. Following these stipulations and the largely corroborative testimony of an officer on the MEG surveillance team, the State rested.

Defendant testified to the following: In spring, 1986, he was developing his own automobile body repair business. He worked out of his garage on Kedzie Avenue and also rented a garage on Normandy Avenue from a Chicago police officer. From 6 p.m. to 6 a.m., he worked handling calls for Mike's Towing.

Defendant knew several persons, including Herman Venegas, who frequented the bar next door to his garage and whose cars he sometimes worked on, to be drug dealers. Beginning in April 1986, George Keleman, a neighborhood friend of defendant, began coming to the garage three or four times each week asking if defendant had seen Venegas. Defendant said that he had not, but if he did he would tell Venegas that Keleman was looking for him. In late April, defendant saw Keleman and Venegas go into the bar next door where they remained for approximately an hour.

On May 6, 1986, Keleman stopped by defendant's garage, said that he was looking for Venegas and that he was in trouble with some people he met from the northwest suburbs, where Keleman had recently moved. Keleman explained that he had promised those people a large quantity of drugs but did not have them. Keleman asked defendant and Harris to go to the Wendy's and drop off a Newport package to these people because he was afraid something would happen to him if he went there without the promised quantity of drugs. At first, defendant refused but after Keleman pleaded that it was a matter of life and death and that if defendant and Harris would help him that one time he would not ask for any other favors, defendant and Harris agreed to go. The following day, Keleman came to the garage and gave defendant a Newport cigarette box. Defendant and Harris put the license plates from defendant's car on a customer's white Corvette on which they had been working, and drove it to the Wendy's, where they were approached by a man (Officer Livas), who asked them if they had something for him from George. Defendant responded that they did. A second man, who Livas introduced as Dan (Officer Byron), came up to the car. They gave the cigarette package to Livas, who took it back to the MEG car. While Livas was gone, Byron commented on the nice car

defendant was driving. Defendant explained that they had been working on it. Byron mentioned that he was thinking of having his old Monte Carlo restored. Defendant replied that he had a lot of experience with cars and that if Byron wanted work done, Byron could contact him through the pager he used in his job with Mike's Towing. When Livas returned, he gave defendant $275, which Livas said was the agreed price, and the officers then left. Defendant gave Keleman the money when Keleman came to the garage later that afternoon.

Several days later, defendant and Harris were in Garbo's, a neighborhood bar they often patronized. Keleman came in for a short while and then left. At approximately 9:30 p.m., Byron came in, sat next to defendant and asked where Venegas was, stating that he was supposed to meet Venegas there. Defendant told Byron he didn't know. Byron then asked if Keleman was around, to which defendant replied that he had just left. Byron remained in the bar for approximately an hour, talking primarily about his car.

On May 14, 1986, as defendant was working in the garage he rented, Keleman came in with a paper bag containing three ounces of cocaine. Keleman asked defendant if he could meet some people there in the garage rather than in public. Defendant and Harris told Keleman that it was not a good idea, particularly since the garage was owned by a police officer. Keleman said that the meeting would take only a few minutes and then asked Harris if he would go meet one of the persons and bring him back to the garage. Harris agreed and left. A few minutes later, Keleman said he was going out to buy some cigarettes and left without taking the bag of cocaine. Approximately 20 minutes later, Harris returned with Byron, who asked where Venegas was. Defendant said that he did not know but that Keleman had left a bag for him and would be returning in a few minutes. When defendant and Byron walked out to the street to look for Keleman, Byron stopped at his car and opened the door, but defendant did not see him remove anything. Unable to find Keleman on the street, defendant and Byron returned to the garage. Byron told defendant that he had some money for him, but defendant responded that Byron would have to wait for Keleman. Byron nevertheless removed some money from his shirt pocket, and a few seconds later several police officers entered the garage and placed him and Harris under arrest. Defendant testified that neither he nor Harris touched the money nor the bag of cocaine, and that prior to May 7 and 14, defendant had never been involved in any narcotics transaction or arrested.

In the State's rebuttal, Christine Norwood testified that she and her husband owned Mike's Towing, and that defendant had last worked for them in late 1985. She further testified that drivers carried the company's pagers only during their shifts, after which they returned them to the company or left them in the truck for the next driver. The numbers Norwood testified were those of the company's pagers were not the same as the number Officer Livas testified defendant gave to Byron on May 7.

Defendant and Harris were both found guilty of two counts of delivery of a controlled substance and, after the denial of their post-trial motions, sentenced to concurrent terms of six years' imprisonment. This appeal followed.

OPINION

On appeal, defendant claims he was denied effective representation by his trial counsel. To determine whether a defendant has been denied effective assistance of counsel, reviewing courts generally use the two-part test established in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and first followed by our supreme court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. Under that test, a defendant must show that his counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. The fundamental concern underlying this test is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

When evaluating ineffective representation claims, courts ordinarily will not extend their review to areas involving the exercise of judgment, trial tactics or strategy (*People v. McNutt* (1986), 146 Ill. App. 3d 357, 496 N.E.2d 1089), as even the best attorneys would not necessarily agree on the same strategy for a particular case (*Strickland v. Washington*, 466 U.S. at 689, 80 L. Ed. 2d at 695, 104 S. Ct. at 2065; *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513). Thus, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*Strickland v. Washington*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065), and judge counsel's performance not in hindsight but on the basis of all the facts and circumstances at the time of trial (*Strickland v. Washington*, 466 U.S. at 689, 80

L. Ed. 2d at 694, 104 S. Ct. at 2065). Further, a defendant is entitled to competent, not perfect, representation, and the fact that a tactic was unsuccessful does not establish incompetence. *People v. Barfield* (1989), 187 Ill. App. 3d 190, 543 N.E.2d 812.

In rare cases, a defendant claiming ineffective assistance of counsel need not demonstrate actual prejudice. The Supreme Court has recognized that there are some circumstances so likely to prejudice the accused that such prejudice will be presumed. In *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, a companion case to *Strickland*, the Court stated that the sixth amendment requires, at a bare minimum, that defense counsel act as a true advocate for the accused; and that where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *United States v. Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047, followed by the supreme court in *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513.

Defendant contends that the circumstances in this case are such that prejudice must be presumed under the standard in *Cronic* because counsel did not act as a true advocate and failed to subject the State's case to meaningful adversarial testing. It is defendant's position that his attorney adopted a defense theory which conceded his guilt, in that pleading the defense of entrapment required him to admit commission of the offenses; and that because counsel did not thereafter present any evidence of entrapment by police officers or agents, the jury, like that in *Hattery*, had no other option but to find him guilty. Defendant asserts that counsel's unprofessional performance resulted from his misapprehension of the law of entrapment. Defendant argues that counsel apparently believed that entrapment could be established merely by showing that defendant was coerced to sell drugs by an acquaintance, *i.e.*, George Keleman, without also showing that Keleman was a police officer or agent. Defendant maintains that counsel's decision to plead entrapment without producing evidence of police inducement amounted to the functional equivalent of a guilty plea eliminating the requirement of proving actual prejudice.

Defendant alternatively contends that even if counsel's performance is analyzed under the *Strickland* test, he has met his burden of showing that he was prejudiced by counsel's failure to comprehend the defense theory he advanced. Relying primarily on *People v. Chandler* (1989), 129 Ill. 2d 233, 543 N.E.2d 1290, defendant ar-

gues that because the jury was properly instructed on the law of entrapment, the only way it could have acquitted him was to improperly ignore the court's instruction. We do not find counsel's representation in the case at bar ineffective under either the *Hattery* or *Chandler* analysis.

In *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513, notwithstanding the entry of a plea of not guilty, defense counsel conceded the defendant's guilt of the murder and his eligibility for the death penalty in the opening statement, presented no evidence and made no closing argument during the guilt/innocence phase of trial. Counsel's strategy consisted solely of attempting to show through cross-examination that defendant's actions were the result of compulsion, which is not a defense to murder, though it is a mitigating factor sufficient to preclude imposition of the death penalty. Applying the *Cronic* standard, the court reversed the defendant's conviction, finding that his counsel's strategy of conceding guilt, without the defendant's consent, merely in the hope of obtaining a more lenient sentence deprived the defendant of the right of having the State's case subjected to meaningful adversarial testing required by the sixth amendment.

In *People v. Chandler* (1989), 129 Ill. 2d 233, 543 N.E.2d 1290, the defendant was charged with residential burglary, arson and four counts of murder, including felony murder and murder based on accountability. At trial, defense counsel failed to present any witnesses, failed to cross-examine several key prosecution witnesses and conducted only a cursory examination of others. In closing argument, counsel conceded that the defendant had entered the victim's home but argued that the defendant should not be convicted of murder because his codefendant, not he, had stabbed and killed the victim. The defendant was found guilty of murder and was sentenced to death.

On appeal, the defendant argued that counsel's concession of guilt constituted *per se* ineffective assistance of counsel under *Hattery*. The *Chandler* court disagreed, finding that counsel's remarks did not constitute an unequivocal concession of guilt as those in *Hattery*. The court also observed that the holding in *Hattery* had been narrowed in *People v. Johnson* (1989), 128 Ill. 2d 253, 538 N.E.2d 1118, in which the court held that a concession of guilt by defense counsel does not always constitute *per se* ineffectiveness of counsel. The *Johnson* court reasoned that counsel risks losing credibility with the trier of fact if he contests those charges of which there is overwhelming evidence of guilt and no reasonable defense.

Thus, the court in *Chandler* ruled that counsel's remarks were not presumptively prejudicial under the *Hattery* analysis.

The *Chandler* court did, however, find that the defendant met his burden under the *Strickland* test. The court noted that defense counsel's strategy, of convincing the jury that although defendant had broken into the victim's home he did not kill the victim, was based on counsel's mistaken belief that the jury could acquit the defendant of murder if it believed he did not inflict the fatal stab wounds. The court observed that since the jury was properly instructed on the law of accountability and felony murder, even if counsel had succeeded in persuading the jury that defendant did not stab the victim, the jury could return a not guilty verdict only if it improperly ignored those instructions. The *Chandler* court concluded that defense counsel's failure to present any evidence or effectively cross-examine the State's witnesses, together with his incomprehension of the law of accountability and felony murder, amounted to no defense at all and deprived defendant of a fair trial. The court also found that there was a reasonable probability that but for counsel's deficient performance, the result of the trial would have been different.

■■ With regard to counsel's performance in the instant case, a review of the entire record reveals, first, that counsel: filed and argued a pretrial motion for severance; presented a cogent opening statement; interposed valid objections and side-bar arguments during the State's case; thoroughly cross-examined the State's witnesses on key points of testimony; conducted a comprehensive direct examination of defendant; moved for a directed verdict; made a forceful closing argument stressing the State's burden of proof, challenging the credibility of the State's witnesses, noting the inconsistencies in testimony and the absence of various pieces of evidence, and arguing the improbabilities of the prosecution's case; requested an instruction on the lesser offense of possession; presented a written and oral motion for a new trial, compiled a file of character reference letters, including one from a gang crimes unit commander recommending leniency, and made an effective presentence argument in mitigation, all which the trial judge expressly stated persuaded him to impose the minimum sentence; and prepared a notice of appeal. In contrast to counsel in *Hattery* and *Chandler*, defense counsel acted competently and conscientiously in the overall preparation and trial of defendant's case.

We turn then to defendant's argument that defense counsel's performance was nevertheless prejudicially deficient because he pur-

sued a defense theory, *i.e.*, entrapment, which he did not understand, which he adduced no evidence to support, and which left the jury no choice but to return a guilty verdict.

Initially, we note that prior to trial, defense counsel declared his intention to defend on the theory of entrapment. He also stated in his opening remarks that there was no dispute that defendant had transferred the cigarette package, which contained 3.5 grams of cocaine, to the undercover officers on May 7; and that he gave "some narcotics to some undercover police officers." A close reading of the opening statement further reveals, however, that defense counsel never conceded that defendant delivered the 83.3 grams of cocaine to the officers on May 14. With respect to that date, counsel stated only that "there was a quantity of cocaine in that garage that afternoon," and that $5,100 "was brought by these officers and transferred to Mr. Harris *or* to [defendant]" (emphasis added). He asserted that the cocaine was brought to the garage not by defendant, but by Keleman, whom he described as "the person working with the police officers for some specific reason." Counsel suggested that Keleman had a prearrangement with the police and that he left the garage under the pretense of going to the store so as to leave defendant "holding the bag" when the police arrived.

Neither, as defendant asserts, did counsel elicit from defendant a confession of the May 14 delivery. Defendant denied, both on direct and cross-examinations, that he handled the bag of cocaine or the money, or otherwise participated in the delivery of narcotics that day. Counsel later argued this denial in support of his request for an instruction on the lesser offense of possession of cocaine on the ground that the jury could believe that, at most, defendant was, by virtue of his control of the premises and knowledge of the presence of cocaine, guilty of "constructive possession" of narcotics. The trial court acknowledged that "the thrust of [defendant's] testimony was denial," and the prosecutor agreed.

The focus of defense counsel's closing argument with respect to the events of May 14 was credibility and reasonable doubt. He argued, essentially, that the meeting was a "set up" by Keleman and the police, and that Byron was lying when he testified that defendant sold him the cocaine. He pointed out the failure of the State to produce evidence of defendant's fingerprints on either the bag of cocaine or the money and the absence in the police reports of many of the facts about which the officers testified. He concluded his argument with an entreaty to the jurors that if they could not resolve all doubts they had, it was their duty to find defendant not guilty.

Thus, counsel's concession of defendant's guilt was only as to the delivery of 3.5 grams of cocaine, a Class 2 felony, on May 7. He did not concede defendant's guilt of the delivery of 83.3 grams, a Class X felony, on May 14. Consequently, defendant's claim of ineffective assistance on that basis must fail.

■ Finally, we consider defense counsel's decision to assert entrapment as to the May 7 transaction and defendant's claim that counsel did not understand the elements necessary to support the defense. It is axiomatic that in pleading entrapment, an accused necessarily admits having committed the crime, albeit only because of improper governmental inducement. (*People v. Gillespie* (1990), 136 Ill. 2d 496, 557 N.E.2d 894; *People v. Fleming* (1971), 50 Ill. 2d 141, 277 N.E.2d 872.) However, as with any other affirmative defense, in order to raise the defense of entrapment at trial, a defendant need only present some "slight evidence" that he was entrapped (*People v. Wielgos* (1991), 142 Ill. 2d 133, 136, 568 N.E.2d 861; *People v. Raess* (1986), 146 Ill. App. 3d 384, 496 N.E.2d 1186), whereupon it becomes incumbent upon the State to prove, in addition to each of the statutory elements of the offense, the absence of entrapment beyond a reasonable doubt (*People v. Tipton* (1980), 78 Ill. 2d 477, 401 N.E.2d 528; *People v. Raess*, 146 Ill. App. 3d 384).

The record reveals that counsel understood that it was necessary to show governmental inducement. In pretrial remarks he stated that defendant's position would be that he was "induced by a police officer and/or agent of the police officer to act in the manner that he did." Counsel posited that theory in his opening statement, saying that Keleman was a "dope dealer" who was "working with the police officers for some specific reason." From the evidence earlier summarized, it is clear that counsel then attempted to deduce, through the cross-examination of the police officers and the direct examination of defendant, that the informant, whom Officer Livas claimed was anonymous, and whom Byron stated was a man named "Nick," was actually Keleman; that Keleman had contacted the police and arranged the drug transaction to "work off a beef"; that defendant had no criminal record whatsoever; that the incautious manner in which defendant conducted himself during the May 7 drug transaction was inconsistent with that of an experienced drug dealer; that he was not predisposed to commit this or any other crime; and that he made the cocaine delivery only because Keleman prevailed upon their friendship to induce him to do so.

In our view, defense counsel elicited sufficient evidence to meet the threshold requirement for raising the defense of entrapment,

and by doing so, placed upon the State the additional burden of disproving the defense. That the entrapment defense was not successful does not render counsel's decision to employ it or his performance in advancing it deficient.

Further, defendant does not suggest nor, on the basis of the overwhelming evidence in the record before us, can we conceive of another defense theory which would have been any more effective. Counsel asserted both entrapment and reasonable doubt. He subjected the State's case to vigorous and meaningful adversarial testing. There is no reasonable probability that but for defense counsel's trial strategy and performance the result of the trial would have been different. Defendant received effective representation, and his conviction is, therefore, affirmed.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.