THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICKEY FLORES, Defendant-Appellant.

Second District   No. 2—91—0432

Opinion filed May 20, 1993.

McLAREN, J., specially concurring.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

After a bench trial, the trial court found defendant, Rickey Flores, guilty of armed robbery (Ill. Rev. Stat. 1991, ch. 38, par. 18–2(a)). The trial court sentenced defendant to six years' imprisonment. Defendant appeals contending: (1) the trial court erred in refusing to allow him to withdraw his waiver of a jury trial on the ground that the waiver was not knowing and intelligent, and (2) his trial counsel was ineffective. We affirm.

The following evidence was presented at defendant's trial. Ariel Sanchez, a minor, testified for the State. Sanchez testified that on August 16, 1989, he, defendant and Minor Velasquez decided to rob the Delta Sonic Car Wash (Delta Sonic) in Elmhurst, Illinois. According to Sanchez, defendant suggested they rob the Delta Sonic because he had previously done work on the roof of that establishment. The three individuals gathered supplies, including nylon stockings to use as masks, extra sets of clothing, a bag, rope, and a baseball bat. They then discussed what each person's job would be in the robbery. Sanchez was to hold the bag and carry the money. Velasquez was to be the lookout. Defendant was to do the talking and carry the bat.

Sanchez, Velasquez, and defendant drove to the Delta Sonic and parked in the adjacent Burger King parking lot. They put the stocking masks over their heads and walked the short distance to the Delta Sonic. Defendant was carrying the bat. They arrived at the Delta Sonic as it was closing. They noticed a man in the parking lot. Sanchez later learned that this man was Robert Maggi. The three individuals approached Maggi. Defendant was holding the bat with his fists together as if he were about to hit a ball. Defendant instructed Maggi to return to the building and turn off the alarm. Maggi complied. All four individuals entered the building.

There were two safes in the car wash. One safe was in the office and one was outside the office. Defendant instructed Maggi to open the safe outside the office. Maggi complied and Sanchez took the money and threw it into the bag. Defendant then instructed Maggi to open the safe inside the office. Sanchez took the money from that safe and put it into the bag. Velasquez took Maggi's wallet and he also took two cartons of cigarettes from the car wash's convenience store.

Sanchez claimed defendant then told Maggi to lie on the floor and count to 100. Defendant also told Maggi there was someone outside the store with a shotgun. The three left the Delta Sonic and ran to the car. On their way back to the car, they dropped some of the money, the cigarettes, the bat, and two of the masks. They did not bother to pick up these items. They returned to Velasquez' house and split up the money. Each person received $1,500.

On cross-examination, defendant's attorney elicited testimony from Sanchez that it was Sanchez who recruited Velasquez, but that Sanchez told Velasquez defendant had planned the robbery. Defendant's counsel also elicited the statement that during the alleged robbery defendant told Maggi, "If you don't move I am going to kick your ass."

Officer Michael Campise of the Elmhurst police department testified for the State. Campise stated that at 10:36 p.m. on August 16, 1989, he made a traffic stop of a car which had no registration tags. According to Campise, Velasquez was the driver of the car and there were two passengers. Campise testified that "the subject sitting *** at the defense table *** looks familiar as the subject, possibly sitting in the front passenger side." He also noticed a bat in the backseat of the car. Velasquez explained to Campise that he carried the bat with him for protection. Campise did not further detain the occupants of the car.

Officer Herb Hogberg of the Elmhurst police department also testified for the State. Hogberg was involved with the investigation of

the Delta Sonic robbery. Hogberg stated that a carton of cigarettes, nylon stockings, and a baseball bat were recovered from the Delta Sonic. The State attempted to elicit testimony from Hogberg that defendant made incriminating statements to Hogberg. The trial court granted defendant's motion to suppress these statements.

Robert Maggi testified for the State that he was the night manager of the Delta Sonic. He stated that at approximately 10:30 or 11 p.m. on August 16, 1989, he locked up the Delta Sonic and as he was getting into his car he noticed some movements behind the building. As he then got out of his car, three men approached him. Two were carrying baseball bats and all three had stocking masks on their heads. He could not identify the men, but he stated the taller of the men appeared to be the leader. Of the shorter men, one was heavy and the other was thin.

The taller man, who was carrying a bat, told Maggi to return to the building and open it up. Two of the men pushed him toward the building by prodding him with a bat. At their insistence, he disengaged the alarm. He testified that there were two safes in the Delta Sonic. One was in the car wash portion of the establishment and the other was in the convenience store portion. Each safe had a top compartment which contained $150 and a set of keys to the bottom compartment. The bottom compartment of each safe contained the day's receipts. The men ordered Maggi around to the back of the building to the car wash safe. Pursuant to the men's demands, Maggi opened both compartments of the safe, and one of the shorter men took the money. The men then directed Maggi to the convenience store and ordered him to open the safe located there. Maggi stated he had trouble opening the second safe because it was dark inside the store. The short heavy man suggested that they hit Maggi, but the taller man insisted that they give him another chance. Maggi eventually opened the second safe and the men took the money. The short thin man was grabbing items off of the store shelves. According to Maggi, it was also the short thin man who took the money out of the safes.

Maggi was ordered to lie on the floor and count to 100, and was also told that there was another man waiting outside with a shotgun. After the men left, Maggi got up and noticed his wallet and car keys, which he had left by the alarm, had been stolen. He called the police. Maggi stated that during the incident he was threatened with bodily harm five times and prodded in the back with the bat. We turn now to our discussion of the issues raised on appeal.

## I. WAIVER OF RIGHT TO JURY TRIAL

First, defendant contends the trial court erred in refusing to permit defendant to withdraw the waiver of his right to a jury trial. The record reveals that, prior to trial, defendant's attorney attempted, unsuccessfully, to negotiate a plea agreement with the State whereby defendant would plead guilty to the lesser included offense of robbery.

The record also reveals that, until the date of trial, different prosecuting attorneys represented the State throughout the proceedings in this cause and different judges presided over the proceedings as well. One judge, on June 28, 1990, presided over the hearing on defendant's motion to strike the indictment. Craig Chval represented the State. The same judge continued to preside through the September 27, 1990, hearing, after which he left the trial court. Beginning July 26, 1990, Jill Wilger represented the State. Her representation continued through the January 7, 1991, hearing, although Chval took her place a few times. Another judge began to preside over the proceedings at the October 19, 1990, status hearing and continued to preside through the January 7, 1991, hearing, and, on January 7, 1991, accepted defendant's jury waiver and continued the case for trial. The trial began on February 5, 1991. Because prosecutor Wilger was sick, Jeffrey Kendall and Robert Kleeman represented the State. Judge Mehling presided.

On the day of trial, the judge inquired as to whether the cause was up for a bench trial. Defendant's attorney replied in the affirmative and stated that he was close to reaching a plea agreement with the State. The trial court passed the case so that defendant's attorney could speak with prosecutors Kendall and Kleeman. The parties, however, were unable to reach an agreement.

After a hearing on some preliminary matters, and after the prosecutor again refused to reduce the charge to robbery, defendant's counsel moved to withdraw his jury waiver on the ground that it was based on the assumption that he would reach a plea agreement with the State. Defendant's attorney argued that he had been close to reaching an agreement with Wilger and that it was unfair for the State to substitute Kendall and Kleeman, who refused to agree to the reduced charge. The trial court denied defendant's motion and the parties proceeded to trial on the armed robbery charge.

■ A defendant's waiver of his right to a trial by jury must be knowing and intelligent. (Ill. Rev. Stat. 1991, ch. 38, par. 103—6; *People v. St. Pierre* (1992), 146 Ill. 2d 494, 508.) Defendant must understand the right he is giving up and the consequences of the waiver.

154

(*People v. Catalano* (1963), 29 Ill. 2d 197, 202; *United States v. Rosa* (7th Cir. 1991), 946 F.2d 505, 507.) Whether to allow a defendant to withdraw a jury waiver that has been knowingly and intelligently made is within the discretion of the trial court. *People v. Hall* (1986), 114 Ill. 2d 376, 414.

At the January 7, 1991, hearing, when asked whether he wanted a jury trial or a bench trial, defendant stated that he wanted a bench trial. The record establishes that on that same day defendant signed a form which stated that he had been advised of his right to a trial by jury and that he waived that right, electing instead to be tried by the court. Defendant was represented by counsel when he executed the jury waiver. These facts are sufficient to establish that defendant knowingly and intelligently waived his right to a jury trial. *People v. Clauson* (1989), 182 Ill. App. 3d 268, 273; *People v. Villareal* (1983), 114 Ill. App. 3d 389, 392.

Defendant contends his jury waiver was not knowing and intelligent, however, because it was based on the mistaken belief that the State would agree to allow him to plead guilty to simple robbery. Defendant is correct in asserting that a change in circumstances can sometimes entitle a defendant to withdraw his guilty plea. (*People v. Norris* (1978), 62 Ill. App. 3d 228, 233; *People v. Smith* (1973), 11 Ill. App. 3d 423, 425.) However, the record belies defendant's assertion that his jury waiver was based on his belief that the State would agree to a reduced charge. At the January 7, 1991, hearing, when defendant executed his jury waiver, the issue of whether defendant's charge would be reduced from armed robbery to robbery was still unresolved. That defendant or his counsel hoped that the State would eventually agree to the reduced charge does not invalidate defendant's waiver.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

■ Next, defendant contends that his trial counsel's performance was constitutionally defective because he failed to subject the State's case to meaningful adversarial testing. The State points out that defendant did not raise his ineffective assistance of counsel claim in his post-trial motion. Issues not raised before the trial court are generally waived on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) However, the defendant's trial counsel, the same attorney who defendant now claims was ineffective, prepared defendant's post-trial motion. Furthermore, the alleged errors are substantial and of constitutional magnitude. Therefore, we will review defendant's ineffective assistance of counsel claim under the plain error doctrine. *People v.*

*Chandler* (1989), 129 Ill. 2d 233, 242; *People v. Siverly* (1990), 194 Ill. App. 3d 981, 989.

In order to succeed on a claim of ineffective assistance of counsel, defendant must show that his "counsel's shortcomings were so serious as to 'deprive the defendant of a fair trial, a trial whose result is reliable.' " (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) Defendant must also show that he was prejudiced by his attorney's errors. In other words, he must "establish 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Albanese*, 104 Ill. 2d at 525, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

When considering defendant's claim of ineffective assistance of counsel, we entertain a strong presumption that defendant's attorney acted within the wide range of reasonable, competent assistance. (*People v. Johnson* (1989), 128 Ill. 2d 253, 266; *People v. Joyce* (1992), 234 Ill. App. 3d 394, 408.) We also generally refuse to second-guess defendant's attorney's trial strategy. *People v. Potthast* (1991), 219 Ill. App. 3d 714, 720; *People v. Bell* (1987), 152 Ill. App. 3d 1007, 1011.

In some exceptional cases, where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," prejudice is presumed and defendant need not show that his counsel's errors resulted in actual prejudice. (*United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047; *People v. Hattery* (1985), 109 Ill. 2d 449, 461.) Courts will presume prejudice only in an extremely narrow class of cases where there has not been a true adversarial relationship between defendant and the State. *People v. Watts* (1992), 226 Ill. App. 3d 519, 523; *People v. Pickett* (1991), 217 Ill. App. 3d 426, 428-29.

■ Defendant essentially argues he was denied effective assistance of counsel in this case because: (1) defense counsel conceded defendant's guilt; (2) defense counsel's argument that defendant should have been prosecuted for robbery rather than armed robbery was unreasonable because a bat is a dangerous weapon within the meaning of the armed robbery statute; (3) defense counsel's argument that the State was collaterally estopped from prosecuting defendant on the charge of armed robbery because defendant's accomplices pleaded guilty to robbery was contrary to existing case law; and (4) defense counsel argued it was "wrong" to prosecute a young man with no criminal history on a Class X felony charge. We turn now to our discussion of these contentions.

First, defendant argues that he was deprived of effective assistance of counsel because defense counsel conceded his guilt. We disagree.

Defendant is correct that a defense attorney's concession of his client's guilt can fall into the extreme class of ineffective assistance of counsel where prejudice is presumed. (*People v. Hattery* (1985), 109 Ill. 2d 449, 465.) In *People v. Hattery*, defendant was accused of murdering a woman and her two young children. Defendant pleaded not guilty. At trial, however, defense counsel conceded that defendant was guilty of the murders and that he was eligible for the death penalty. Counsel's strategy throughout the guilt phase of the trial was to convince the jury that it should not sentence defendant to death. (*Hattery*, 109 Ill. 2d at 458-59.) Counsel never presented any evidence nor made any argument in support of any defense to murder. Instead, when cross-examining the State's witnesses, he attempted to elicit testimony which tended to prove that defendant was under a compulsion to commit the murders. While compulsion is not a defense to murder, it can be a mitigating factor at sentencing. *Hattery*, 109 Ill. 2d at 459.

The court held defense counsel's unequivocal concession of defendant's guilt prevented the State's case from being subjected to " 'meaningful adversarial testing.' " (*Hattery*, 109 Ill. 2d at 464, quoting *United States v. Cronic* (1984), 466 U.S. 648, 656, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045.) The court emphasized that in that case, despite defendant's plea of not guilty, counsel provided the jury with no opportunity to determine whether defendant was guilty. (*Hattery*, 109 Ill. 2d at 464.) Even where the State's case is strong, a defendant who pleads not guilty is entitled to force the State to meet its burden of proof beyond a reasonable doubt. (*Hattery*, 109 Ill. 2d at 465.) The court held that even if counsel's strategy might have seemed reasonable in light of the overwhelming evidence of defendant's guilt, that strategy was nevertheless impermissible. Therefore, prejudice was presumed and defendant did not need to show that the result of his trial would have been different had counsel acted permissibly. *Hattery*, 109 Ill. 2d at 464-65.

However, *Hattery* has been read narrowly. Prejudice is only presumed where defense counsel has clearly, unequivocally, and without defendant's consent conceded *every* significant aspect of defendant's guilt. See *People v. Campos* (1992), 227 Ill. App. 3d 434, 447.

More recently, our supreme court held that defense counsel does not always harm his client by conceding his client's guilt. In *People v. Johnson* (1989), 128 Ill. 2d 253, 269-70, defense counsel conceded

defendant was guilty of murder but did not concede other charges facing defendant. Because the evidence was overwhelming that defendant committed the murder, and because defense counsel provided defendant with a defense to some of the State's charges, the court concluded *Hattery* did not apply. (*Johnson*, 128 Ill. 2d at 270.) According to the court:

"In situations where there is overwhelming evidence of guilt and no defense, if counsel contests all charges he is liable to lose credibility with the trier of fact when it comes to charges where a legitimate defense exists." *Johnson*, 128 Ill. 2d at 270.

Where a defendant literally has no defense, defense counsel need not manufacture one. (*People v. Ganus* (1992), 148 Ill. 2d 466, 473; *People v. Young* (1991), 220 Ill. App. 3d 98, 108.) Thus, while part of defense counsel's strategy in this case appears to have been based on the hope that the trial judge would decline to follow the law (see *United States ex rel. Barnard v. Lane* (7th Cir. 1987), 819 F.2d 798, 804), defense counsel did not clearly and unequivocally concede his client's guilt to the armed robbery. Therefore, *Hattery* is not controlling and, accordingly, there is no presumption of prejudice.

In his opening statement, defendant's trial attorney stated, "[w]e have pointed out that we are not questioning at this time the presence and even some participation by Rick Flores in the unhappy occasion." However, at no point did defense counsel concede that defendant used a bat in the robbery. Nor did counsel admit the "guilt" of his client to either robbery or armed robbery. Thus, defense counsel's arguments did not amount to ineffective assistance of counsel.

Defendant next argues he was deprived of effective assistance of counsel by defense counsel having argued that defendant should have been prosecuted for mere robbery rather than armed robbery, by contending that a bat is not a dangerous weapon within the meaning of the armed robbery statute, and that, thus, defense counsel's argument was unreasonable. "Robbery" is defined as the taking of the property of another by using or threatening to use force. (Ill. Rev. Stat. 1991, ch. 38, par. 18–1(a).) A person commits armed robbery by committing robbery while armed with a dangerous weapon. (Ill. Rev. Stat. 1991, ch. 38, par. 18–2(a).) Unlike armed robbery, which is a Class X offense, robbery is probationable. In a motion to strike the indictment, defendant's attorney attempted to convince the court to reduce the charge from armed robbery to robbery. Defense counsel argued that defendant could not be prosecuted for armed robbery because the baseball bat was not a dangerous weapon because it was aluminum and because defendant never threatened anyone with it.

At the close of the State's evidence, defense counsel moved for a directed finding that defendant was not armed with a dangerous weapon when he committed the robbery. In support of that motion, defendant's attorney argued at one point, "Certainly, this [the bat] is not an object which was dangerous *per se* and in the use, there is no indication that this man who seemed to hold a bat at all times did not do otherwise with the bat and, as to threaten immediate harm except make a suggestion." Defense counsel also made a great deal of Maggi's testimony that the taller man, apparently defendant, told the shorter man not to beat Maggi but to give him another chance.

Whether the baseball bat used in the robbery was a dangerous weapon depends on the character of the baseball bat and its susceptibility for use in a manner likely to cause death or serious injury. (*People v. Skelton* (1980), 83 Ill. 2d 58, 65; *People v. Dwyer* (1927), 324 Ill. 363, 365; *People v. Westefer* (1988), 169 Ill. App. 3d 59, 61.) The purpose of the armed robbery statute is to treat more severely a person who commits a robbery while possessing a weapon actually capable of causing serious injury than a person who commits a robbery without possessing such a weapon. *Skelton*, 83 Ill. 2d at 64.

In defining the term "dangerous weapon" for the purposes of the armed robbery statute, courts have divided objects into four categories. (*People v. de la Fuente* (1981), 92 Ill. App. 3d 525, 535-36.) The first category contains objects which are dangerous *per se* such as knives and loaded guns. (*People v. Neither* (1988), 166 Ill. App. 3d 896, 900; *de la Fuente*, 92 Ill. App. 3d at 535.) A knife or a loaded gun, when used in a robbery, is always considered a dangerous weapon. The second category contains objects which are never dangerous weapons. For example, our supreme court held that a 4½-inch plastic toy gun, as a matter of law, was not a dangerous weapon. (*Skelton*, 83 Ill. 2d at 66.) The third category contains objects which are not necessarily dangerous weapons but can be used as such. (*Dwyer*, 324 Ill. at 364-65.) Unloaded guns or toy guns made of heavy material fall into this category, since they are incapable of shooting bullets but can be used as bludgeons. (*People v. Bayless* (1981), 99 Ill. App. 3d 532, 538.) Whether an object in this category is a dangerous weapon is a question of fact to be resolved by the trier of fact. (*Skelton*, 83 Ill. 2d at 66; *People v. Garcia* (1992), 229 Ill. App. 3d 436, 438.) The fourth category contains objects which would normally fall into the third category, but which were actually used in a dangerous manner in the course of the robbery. *de la Fuente*, 92 Ill. App. 3d at 536 (where defendant actually bludgeoned victim with unloaded gun).

Our supreme court explained in *Dwyer*:

"Where the weapon in question and the manner of its use are of such character as to admit of but one conclusion, the question whether or not it is deadly is one of law for the court to determine, but when the character of the weapon is doubtful or the question depends upon the manner of its use it is a question for the jury to determine from a description of the weapon, from the manner of its use and the circumstances of the case." *Dwyer*, 324 Ill. at 365.

Accordingly, the issue here is whether, given the facts of this case, the trial court could have found that the baseball bat was not a dangerous weapon. Because a baseball bat was not designed to cause injury, it is not inherently dangerous as is a knife or a loaded gun. Being that this issue presents a question of fact, we believe that it is conceivable that the trial court in this case could have found that the bat used in the robbery was not a dangerous weapon. (*Skelton*, 83 Ill. 2d at 65; *Dwyer*, 324 Ill. at 365.) Thus, the arguments of defense counsel to that effect did not deprive defendant of effective assistance of counsel.

In attempting to convince the trial court in this case that the baseball bat used in the robbery was not a dangerous weapon, defense counsel employed a defense strategy that was desperate and, ultimately, unsuccessful. However, a defendant cannot generally make out a claim for ineffective assistance of counsel based on his counsel's trial strategy. *People v. Shum* (1987), 117 Ill. 2d 317, 370; *People v. Madej* (1985), 106 Ill. 2d 201, 214; *People v. Whittaker* (1990), 199 Ill. App. 3d 621, 628-29.

Defendant also contends he was denied effective assistance of counsel when defense counsel argued at trial that collateral estoppel precluded defendant's conviction of armed robbery because his accomplices were permitted to plead guilty to the lesser included offenses of robbery. This argument conflicts with the clearly established rule that a defendant can be prosecuted for an offense even where accomplices to the same offense are not prosecuted or are prosecuted for lesser offenses. (*People v. Bartlett* (1980), 91 Ill. App. 3d 138, 142; see also Ill. Rev. Stat. 1991, ch. 38, par. 5—3.) However, such an argument does not amount to ineffective assistance of counsel.

Lastly, defendant argues he was denied effective assistance of counsel when defense counsel argued that defendant should not be convicted of a Class X felony because of his age and his lack of prior criminal history. Defendant was 19 years of age at the time. At the July 28, 1990, hearing, counsel attempted to convince the trial court to strike the indictment. Defense counsel argued:

"The way the Statute has been reading, that the mere presence of a gun, mere presence, you know, this is a very important thing

because it is a difference between an 18 year old kid being eligible, who has no record, being eligible for probation. So we can, and make a life for somebody and having somebody with a Class X and get him into, into the company that is going to make him a career criminal for the rest of his life when he gets out as an old man. It doesn't make any sense at all."

This conversation is indicative of defense counsel's trial strategy. Defense counsel attempted to convince the trial court that following the law would produce an inequitable result. Again, a defendant cannot generally make out a claim for ineffective assistance of counsel based on counsel's trial strategy. *People v. Shum*, 117 Ill. 2d at 370; *People v. Whittaker*, 199 Ill. App. 3d at 628-29.

Thus, we conclude based on the entire record, including the unshaken testimony of coperpetrator Sanchez, the evidence of defendant's guilt of armed robbery was overwhelming and, accordingly, there is no reasonable probability that, but for defense counsel's performance, the result would have been different. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Chandler*, 129 Ill. 2d at 248-50; *People v. Albanese*, 104 Ill. 2d at 524-27.) We emphasize the fact that trial counsel in this case succeeded on a motion to suppress defendant's statements, cross-examined all witnesses, vigorously argued to the trial judge the legitimate defense theory that the bat was not (factually) a dangerous weapon and, throughout the trial, engaged in meaningful adversarial testing of the State's case.

Trial counsel's performance, tactics, and strategy, when viewed in light of the evidence presented in the case, cannot be described as deficient or having fallen below an objective standard of reasonableness or having deprived defendant of a fair trial. (*People v. Winsett* (1992), 153 Ill. 2d 335, 346-47, 364-65; *People v. Hrobowski* (1991), 216 Ill. App. 3d 711, 724-26.) Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

UNVERZAGT, J., concurs.

JUSTICE McLAREN, specially concurring:

I concur in the opinion but wish to clarify a point regarding *People v. de la Fuente* (1981), 92 Ill. App. 3d 525. *de la Fuente* (92 Ill. App. 3d at 535-36) attempts to classify four categories of deadly weapons. However, I believe that the second category is essentially the same as the

fourth category because the fourth category merely determines that an object becomes a deadly weapon when it is used in a deadly manner.

If the issue were only whether there were three or four classes, I would let this point pass. However, *de la Fuente* determines that fourth class deadly weapons are dangerous *per se* because of the manner in which they were actually used. I believe this holding does violence to the definition of *per se*. I believe a *per se* deadly weapon is a deadly weapon regardless of how it is used. Thus, a deadly weapon, based upon its use, does not become a *per se* deadly weapon simply because it was used in a deadly manner.

In the instant case, the defendant's counsel argued that the baseball bat was not a deadly weapon because it was not actually used as such. I do not wish to imply, by my concurrence, that I agree a baseball bat becomes a *per se* deadly weapon when used as a bludgeon. Regardless whether a baseball bat is or may be used as a bludgeon, it does not, in my opinion, become a *per se* deadly weapon simply because it was used in a deadly manner. My concurrence is an attempt at ameliorating the corruption of the term *"per se* deadly weapon."

In all other aspects of the opinion, I concur.