2021 IL App (1st) 181602-U

Nos. 1-18-1602, 1-18-1619, and 1-18-1625 cons.

Second Division
August 17, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | Nos. 15 CR 00990 17 CR 09666 17 CR 09667 |
| CARLOS JOHNSON, | ) ) | |
| Defendant-Appellant. | ) ) ) | Honorable Timothy Joseph Joyce Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction is affirmed where the trial court did not err in admitting evidence and defense counsel did not render ineffective assistance. Defendant's sentence is also affirmed where the court did not rely on improper factors in aggravation.

¶ 2    Following a jury trial, defendant-appellant Carlos Johnson was convicted of armed robbery, attempted armed robbery, and first degree murder. The murder conviction was premised

on a theory of defendant's accountability for the actions of a co-defendant during one of the attempted robberies. Defendant was sentenced to a total of 37 years in prison: 25 years for the murder to be served consecutively to 6 years for armed robbery and another 6 years for attempted armed robbery. He now appeals, arguing that (1) the trial court erred in allowing the State to admit into evidence a Facebook photograph of him and a co-defendant, (2) his counsel provided ineffective assistance by conceding his guilt of armed robbery during closing argument, and (3) the trial court considered improper factors in imposing his sentence. For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4                                  A. The Charges

¶ 5      Defendant and co-defendants Tarik Brakes (Tarik), Deafro Brakes (Deafro), and Isiah Penn were indicted for the armed robberies of Reginald Williams and Steve Martin, the attempted armed robberies of twin brothers Demario Bailey (Demario) and Demacio Bailey (Demacio), and the first degree murder of Demario. The offenses were alleged to have occurred within a matter of minutes on December 13, 2014. All co-defendants were juveniles at that time, with defendant being 17 years old. The juvenile court granted discretionary transfers of the armed robbery counts as to defendant, Tarik, and Penn, but declined to transfer those counts as to Deafro. Defendant and Deafro were tried jointly before the same jury, while Tarik was tried simultaneously before a different jury.

¶ 6                                  B. Trial

¶ 7      At trial, Reginald Williams testified that around noon on December 13, 2014, he was walking westbound through a viaduct near the intersection of 63rd and State Streets in Chicago. He observed a group of four males walking toward him, two of whom blocked his path as he

attempted to pass them. One of the males, who had a chipped tooth and wore a black camouflage jacket, put an arm around Williams' neck and held him at gunpoint while the others went through his pockets. The males took Williams' cell phone and money and walked away. Williams continued to a gas station located at the end of the viaduct, where police arrived with suspects for a show-up. Williams identified Tarik as the gunman and defendant as the male who took the cell phone. Williams also went to the police station the next day, where he identified defendant from a physical lineup and Tarik from a photo array. Finally, Williams identified defendant and Tarik as two of the robbers in court.

¶ 8    Steve Martin testified that he also entered the viaduct walking westbound around noon and saw a group of four or five black males walking eastbound on the other side of the street. Two of the males crossed over to Martin's side of the street and confronted him. One of them, whom Martin identified in court as Tarik and described as having a chipped tooth and camouflage jacket, pointed an automatic gun at him while the other male removed the earrings from Martin's ears. Tarik also went through Martin's pockets, taking his cell phone and some money. One of the males who did not cross the street, whom Martin identified as defendant, yelled to "[t]ake his shoes, take his socks, take his belt, take whatever." The robbers started to leave without taking those items but doubled back and forced Martin to enter the passcode to unlock his phone. The robbers then walked away heading east while Martin continued west to the gas station, where he used someone's phone to call the police. The police arrived shortly thereafter and returned with suspects for Martin to identify. Martin identified defendant as one the males who "was with the individuals who robbed [him]." Martin also later identified defendant and Tarik at the police station.

¶ 9    Demacio Bailey testified that he and Demario, his twin brother, were walking through the viaduct on their way to Demacio's basketball practice. They were approached by two black males

and split apart to allow the males to walk between them. However, as the males passed, they grabbed at the Bailey brothers' pockets. A struggle ensued, during which Demario got free and punched one of the assailants. Then, two other black males appeared in the viaduct. One of them, who was wearing a camouflage jacket, walked over and shot Demario. Demacio fled and returned to find his brother once the others also left the viaduct. Demacio flagged down a car and got the driver to call emergency services, but Demario eventually succumbed to a gunshot wound. No property was taken from either of the Bailey brothers. Police later recovered a single .380 caliber shell casing in the street beneath Demario's body.

¶ 10    During a show-up at the scene, Demacio identified three other people, Tracy Norwood, LeShawn Norwood, and David Phillips, as having similar clothing to the culprits. Tracy, LeShawn, and Phillips were processed for the crimes, but later released once surveillance footage from a nearby apartment building confirmed their alibis. Demacio went to the police station the next day and viewed a lineup featuring both defendant and Tarik, but was unable to make an identification. Demacio then returned to the police station later that day to view photo arrays, from which he identified Deafro and Tarik as two of the suspects he saw in the viaduct.

¶ 11    Isiah Penn testified as part of a plea deal under which he agreed to plead guilty to armed robbery in exchange for a sentence of 20 years and the dismissal of the murder charges against him. Penn stated that on the night before the day in question, he was at the Brakes' house with defendant, Tarik, and Deafro. There, he saw Tarik with a black, .380 caliber semiautomatic handgun that Penn testified was a "block gun" meaning "anyone from the block could potentially use [it] if needed." During his direct examination, Penn identified a photograph of defendant and Tarik that was posted on Facebook approximately two and half months prior to the offenses. Over

the defense's objection, Penn testified that the photograph depicted Tarik holding what appeared to be a semiautomatic firearm while defendant stood next to him making a hand gesture.

¶ 12    Penn further testified that he, defendant, Deafro, and Tarik left the Brakes' house on December 13 with a plan to make some money by robbing people in the viaduct. During their first robbery, Tarik held the victim at gunpoint with a black semiautomatic handgun while Penn served as a lookout. After that, Penn and Tarik crossed to the other side of the street because they spotted another potential victim walking down the sidewalk. Tarik again held the victim at gunpoint while Penn took his earrings and phone. During this robbery, defendant yelled from across the street to "get the man's password to the phone," but Penn did not recall whether they were able to do so. After the second robbery, Penn and Tarik walked away until they heard defendant "tussling" with the Bailey brothers on the other side of the street. Penn and Tarik crossed the street to help, at which point Tarik shot Demario. Tarik, defendant, Penn, and Deafro then fled eastbound out of the viaduct and rendezvoused in a nearby apartment building. Penn identified himself and his co-defendants entering and leaving the area around the viaduct in surveillance footage and in several stills taken from that footage.

¶ 13    Chicago police officer Mary Solidum testified that she and her partner, Officer Jose Sanchez, responded to a radio call that afternoon stating that four armed robbery suspects fled the viaduct area heading eastbound. The officers stopped two males, defendant and Jermaine Jones, for a field interview because they matched the description from the radio call. Officer Sanchez asked defendant whether he "had anything on him," at which point defendant produced the cell phone that had been taken from Williams and explained that the "dude just gave it to me." The officers then took defendant and Jones into custody and drove them to the gas station for the show-ups. Jones was later excluded as a suspect and released without charges.

¶ 14    The defense rested without presenting evidence.

¶ 15                              C. Closing Arguments

¶ 16    During closing arguments, defendant's counsel stated that, despite some "minor inconsistencies," the State's witnesses were mostly truthful. Counsel also conceded that defendant was one of the people in the viaduct on the day in question and that the jury "should probably find him guilty of the armed robbery of Reginald Williams." However, counsel argued that defendant should be found not guilty of armed robbery against Martin because, as defendant was on the other side of the street at the time of the offense, his participation was not "active." Although counsel acknowledged that Martin testified that defendant instructed the robbers to take additional items from him, counsel noted that no other witness corroborated those statements and that the items described were not taken from Martin.

¶ 17    Counsel further argued that defendant was not guilty of attempted armed robbery against the Bailey brothers and of Demario's murder. First, counsel argued that the incident could not have started as an attempted armed robbery because there was no firearm present when defendant engaged with the Bailey brothers. Second, counsel argued that the incident was not an attempted robbery at all. In particular, counsel noted that no property was taken from either of the Bailey brothers and that the encounter did not follow the established pattern of taking money from the victim while Tarik held them at gunpoint. Rather, counsel asserted that Demario's shooting "wasn't part of the plan" and that Tarik "acted alone" without defendant's knowledge. In addressing the concept of legal accountability, counsel argued that accountability "doesn't go on forever" and ended in this case once they had successfully robbed Martin and went their separate ways. Therefore, counsel contended that defendant was not legally accountable for Tarik's actions that occurred after the two robberies were over.

¶ 18                                     D. Posttrial Motion

¶ 19     After closing arguments, the jury found defendant guilty on all charges. Defense counsel filed a motion for a new trial, arguing, *inter alia*, that the Facebook photograph was "admitted into evidence without foundation" and was "probative only of bad acts of [defendant] that were unrelated to this [case]." The trial court denied the motion, opining that the Facebook photograph did not present "an evidence of other crimes issue" because the photograph was relevant to the charged offenses in that the gun in the photograph was "the same type of weapon used in connection with these offenses." The court additionally rejected the defense's argument that the photograph constituted improper gang evidence, stating that "no gang evidence was admitted" and that none of the State's witnesses made any mention of gang activity or membership throughout the trial.

¶ 20                                     E. *Krankel* Inquiry

¶ 21     During the hearing on the posttrial motion, defendant also interjected that he "would like to file a motion for ineffective counsel." After ruling on the posttrial motion, the trial judge then initiated a preliminary inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984), explaining to defendant that he would hear his allegations and appoint new counsel for further proceedings "[i]f I believe that there is a reasonable possibility that you have made a good complaint about ineffective assistance of counsel. "As relevant here, defendant stated that counsel, "basically threw me under the bus to say that I was guilty of something" because "if I was guilty of this, how could I not be guilty of the murder [?]" Defendant also claimed that counsel did not inform him that he would concede his guilt of the Williams robbery during closing argument. Counsel, on the other hand, testified that he did in fact discuss the issue with defendant and was "very clear that there was not much chance of beating the armed robberies and that we were pretty much conceding

them." Specifically, counsel stated that, "I told him point blank I'm going to say find him guilty of the one armed robberies [*sic*]," and that defendant "was in agreement" with that strategy. The trial court declined to appoint new counsel, stating that it believed counsel's testimony and that "there was no reasonable possibility that [defendant] could succeed on a claim of ineffective assistance."

¶ 22                                    F. Sentencing

¶ 23    The case proceeded to sentencing, where the court heard victim impact statements from Demario's mother and Demacio. In aggravation, the State recognized that defendant was just 17 years old at the time of the offenses, but argued that he did not deserve "anything close to the minimum" sentence "based on his level of involvement, the nature of these offenses, the life that was lost, [and] the lives that were changed." In mitigation, counsel offered that defendant was raised in a "drug infested" neighborhood by his grandmother until the age of seven because his mother was a drug addict and his father died when he was three. Counsel also contended that defendant was amenable to rehabilitation because of his young age and the fact that he excelled in school and counseling while in custody. Consequently, counsel requested a total sentence of 28 years in prison: 20 years for the murder to be served consecutively to 8 years for armed robbery. Defendant declined to make a statement in allocution.

¶ 24    In announcing the sentence, the trial court opined that defendant's potential for rehabilitation was "not insubstantial," as he was a minor at the time of the offenses, had no prior criminal history, continued his education while in custody, and came from a "supportive" family. On the other hand, the court also stated that the seriousness of the offenses was "beyond compelling," that the defendants showed "no hesitation in embracing the thug life," and that there was no apparent outside pressure that precipitated the crimes. The court further noted that the

offenses were committed with a "block gun," stating that this case was "yet another instance of havoc that gets wrought by just one gun," causing an impact that "ripples out continually long after the events of [December 13, 2014]."

¶ 25    Ultimately, though, the court declined to impose a firearm enhancement on any defendant, stating that it was "clear *** that nobody set out to murder Demario Bailey or anyone else[.]" See 730 ILCS 5/5-4.5-105(b) (West 2018) (giving a trial court discretion in whether to apply a firearm enhancement to a defendant who was under 18 years old at the time of the offense). The court did, however, sentence defendant to a total of 37 years in prison as follows: 25 years for the murder of Demario to run consecutively to (1) a 6-year term for the attempted armed robbery of Demario and (2) three concurrent 6-year terms for the attempted armed robbery of Demacio and the armed robberies of Williams and Martin. Defendant's motion to reconsider the sentence was denied.

¶ 26    This appeal followed.

¶ 27                              II. ANALYSIS

¶ 28                   A. Admission of the Facebook Photograph

¶ 29    On appeal, defendant first argues that the trial court erred in admitting the Facebook photograph of himself and Tarik during Penn's testimony because the photograph was "completely irrelevant, yet highly prejudicial."

¶ 30    This court reviews a trial court's decision on whether to admit evidence for an abuse of discretion. *People v. Lerma*, 2016 IL 118496, ¶ 23. This standard is highly deferential to the trial court, such that an abuse of discretion will be found only where the court's decision is" 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Id.* (quoting *People v. Rivera*, 2013 IL 112467, ¶ 23).

¶ 31    Defendant contends that the photograph was irrelevant to the case at hand because the State "did not connect the gun in the photo to the charged crimes in anyway." Evidence is generally admissible if relevant and inadmissible if irrelevant. *People v. Pikes*, 2013 IL 115171, ¶ 21. Evidence is relevant is it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Although defendant correctly points out that no witness testified that the gun in the photograph was the same gun used in the robberies, we cannot say that the trial court abused its discretion in finding the photograph to be relevant. We have previously held that a weapon is generally admissible where there is some proof connecting it to the crime in question. *People v. Dinwiddie*, 299. Ill. App. 3d 636, 645 (1998). Notably, the State is not required to prove that the weapon is the same one actually used in the offense. *Id.* Rather, "it is only necessary that the weapon be suitable for commission of the crime and in some way be connected to the crime." *Id.* In this case, the evidence showed that the murder weapon was a black, .380 caliber semiautomatic handgun, thereby making the gun in the photograph suitable for the commission of the crimes. The photograph also showed that Tarik, whom the evidence established possessed the murder weapon during the offenses, also possessed a suitable firearm alongside defendant within months of the offense. Accordingly, we find that it was within the trial court's discretion to find the Facebook photograph to be relevant.

¶ 32    We also reject defendant's suggestion that the trial court "refus[ed] to weigh the photo's probative value against unfair prejudice" based on the mistaken belief that the court lacked discretion in admitting the photograph. A trial court is presumed to know the law and follow it properly, and that presumption is only overcome by a "strong affirmative showing to the contrary in the record." *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 62. Defendant's argument is

premised on the trial court's statement that "the typical probative value versus prejudicial effect analysis that is utilized by courts engaging [in] the admissibility of other crimes evidence is not applicable here." However, in context, it is clear that the court was simply rejecting defendant's argument that the photograph was impermissible other crimes evidence because the court found that the gun in the photograph was directly relevant to the charged offenses. See *People v. Illgen*, 145 Ill. 2d 353, 365 (when evidence of other crimes is offered, a trial court must weigh its probative value against its prejudicial effect). Thus, the court correctly stated that the concerns surrounding the admission of other crimes evidence were not at play in this case. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 51 ("In such cases, ordinary relevancy principles apply and the rule related to other crimes is not implicated.")

¶ 33    Of course, even directly relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *Pikes,* 2013 IL 115171, ¶ 21. However, we again disagree with defendant that the Facebook photograph was substantially more prejudicial than probative. The crux of defendant's position is his assertion that the photograph was highly prejudicial because it showed him making a gesture that "can only be interpreted by the average person as a gang symbol." In our view, this argument fails for the simple reason that it is not at all clear that the gesture is gang related. Rather, we agree with the trial court that the gesture is ambiguous at best. Tellingly, defendant offered no evidence in the trial court, in his briefs on appeal, or at oral arguments to support his claim that the gesture is a gang sign, let alone that any reasonable person would interpret it as such. Additionally, we find the risk of prejudice to be minimal, as there was no mention of gang affiliation or activity in this case whatsoever. Under these circumstances, we conclude that the trial court did not abuse its discretion in admitting the Facebook photograph into evidence.

¶ 34                                B. Ineffective Assistance of Counsel

¶ 35    Defendant next argues that his trial counsel rendered ineffective assistance by essentially conceding that he was not only present in the viaduct on the day in question but also guilty of armed robbery against Williams. Specifically, defendant asserts that counsel's concession left the jury with "no choice" but to convict him of all charges and that counsel's strategy was unreasonable because it was "based on a misapprehension of the laws of accountability and felony murder." Consequently, defendant asks this court to remand for a new trial, or, in the alternative, a new *Krankel* hearing at which new counsel would be appointed to represent him. The State, on the other hand, contends that defendant's claims involve only matters of trial strategy and that counsel's strategy was legally sound and reasonable in the face of overwhelming evidence of defendant's guilt.

¶ 36    Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 688 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. Under this standard, a defendant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's errors. *Id.* A defendant's failure to establish either *Strickland* prong precludes a finding of ineffective assistance of counsel. *Id.*

¶ 37    To establish that counsel's performance was deficient, a defendant must overcome a strong presumption that the challenged action was the product of a sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). A trial strategy is unsound only where no reasonable defense attorney would pursue it under similar circumstances. *People v. O'Neal*, 2021 IL App (4th) 170682, ¶ 71. It is insufficient that counsel's strategy proved unsuccessful with the benefit of

hindsight. *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31. Thus, our supreme court has stated that "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Manning*, 241 Ill. 2d at 327. Even so, counsel's strategy may be held unreasonable when he unequivocally concedes the defendant's guilt in every significant aspect without the defendant's consent. *People v. Flores*, 245 Ill. App. 3d 149, 156 (1993). However, conceding a defendant's guilt on only some charges does not necessarily amount to ineffective assistance, especially where the defendant's guilt on those charges was overwhelming and counsel presents a defense to other charges. See *People v. Johnson*, 128 Ill. 2d 253, 270 (1989).

¶ 38     Here, we conclude that defense counsel employed a reasonable trial strategy by conceding defendant's guilt of armed robbery. Indeed, the evidence against defendant on these charges was overwhelming. Both Williams and Martin recalled being robbed at gunpoint in a similar way, and both identified defendant as one of the culprits. This testimony was corroborated by Penn, who admitted to making and carrying out a plan to rob people with defendant. Additionally, defendant was arrested near the scene shortly after the robberies with robbery proceeds on his person. When questioned about the proceeds, defendant offered only the somewhat unbelievable explanation that Williams "just gave" his phone to him. We find this evidence to be overwhelming.

¶ 39     Moreover, we note that counsel adamantly argued that defendant was not guilty of attempting to rob the Bailey brothers, which was the predicate offense for the murder charge. In particular, although counsel acknowledged defendant's presence during the incident with the Bailey brothers, counsel argued that the encounter was not an attempted armed robbery because defendant was neither armed nor attempted to take any property from them.

¶ 40     We disagree with defendant's contention that counsel's concession of his guilt to the earlier robberies left the jury no choice but to convict him of all charges based on the law of accountability

and felony murder. As the jury was instructed, defendant was to be found guilty of murder only if the jury concluded that Demario's death was caused by a person for whom defendant was legally accountable while that person was attempting to commit an armed robbery. The jury was further instructed that a person is legally responsible for the actions of another if, either before or during the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person with the intent to promote or facilitate the offense. See 720 ILCS 5/5-2 (West 2018); Illinois Pattern Jury Instructions, Criminal, No. 5.03 (4th ed. 200). Under these instructions, which are accurate recitations of the law, defendant would not have been guilty of murder if Demario's death did not occur in the context of an attempted armed robbery or if defendant was not intending to promote or facilitate that robbery at some time before or during the offense. Accordingly, the jury could have found defendant not guilty of murder if it accepted counsel's theory that, as evidenced by the deviation from the plan with Williams and Martin, the incident between defendant and the Bailey brothers was not an attempted robbery gone awry. As previously stated, the fact that the jury did not ultimately accept the defense's theory of the case did not render counsel ineffective. *Massey*, 2019 IL App (1st) 162407, ¶ 31. As defendant cannot show that counsel's strategy was deficient, his claim of ineffective assistance of counsel fails.

¶ 41    Nor do we find, as he argues in the alternative, that defendant is entitled to a new *Krankel* hearing. *Krankel* and its progeny govern the treatment of *pro se* posttrial motions alleging ineffective assistance of counsel. *People v. Roddis*, 2020 IL 124352, ¶ 34. Generally, a trial court receiving such a motion must first make a preliminary inquiry into the defendant's claims to determine whether new counsel should be appointed for a full hearing. *People v. Jackson*, 2020 IL 124112, ¶ 97. The chief concern is that the trial court conduct a sufficient inquiry to fully consider the defendant's *pro se* allegations. *Id.* ¶ 98. The court need not appoint new counsel if, after

considering the factual basis of the allegations, the court determines that the claim lacks merit or pertains only to matters of trial strategy. *Id.* ¶ 97. However, the court should appoint new counsel if the inquiry into the defendant's allegations reveals possible neglect of the case. *Id.* Whether a trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*. *Roddis*, ¶ 2020 IL 124352, 33.

¶ 42    The record in this case reveals that the trial court understood and properly exercised its duties under *Krankel*. Once defendant raised a *pro se* claim of ineffective assistance, the court explained that it would conduct a preliminary *Krankel* inquiry in order to assess whether appointing new counsel would be necessary. The court then heard defendant's allegations, which as relevant here, included counsel conceding guilt of armed robbery during closing arguments. The court also heard from counsel, who stated that he informed defendant that "there was not much chance of beating the armed robberies" and that counsel would therefore concede them. See *People v. Ayres*, 2017 IL 120071, ¶ 12 (trial court may base its conclusion on conversations with the defendant, defense counsel, and the court's own knowledge of the proceedings and counsel's performance). According to counsel, defendant understood and agreed to this strategy. After conducting the inquiry, the trial court credited counsel's version of events and determined that defendant's allegations lacked merit. Because the court fully considered defendant's claims and, for the reasons explained above, correctly determined that they involved only matters of trial strategy, no further proceedings under *Krankel* were required.

¶ 43                                C. Sentencing

¶ 44    Finally, defendant challenges his sentence on the basis that the trial court considered three improper factors in aggravation. Specifically, defendant argues the court improperly considered (1) that the crimes were committed with a "block gun" where the use of a firearm was inherent in

the charges and (2) "the damage that [defendant] and his co-defendants' actions caused—and continue to cause—to society in general." On these points, defendant relies on the court's statement that this case was "yet another instance of havoc that gets wrought by just one gun. As it ripples out continually long after the events of [December 13, 2014.]" As the third factor, defendant contends that the trial court improperly focused on the victims' "status in society" by remarking that the Bailey brothers were "admirable beyond measure" for "staying out of trouble, keeping their noses clean, [and] engaging in the kind of activities we want young people to engage in."

¶ 45    A trial court has broad discretion in imposing a sentence, and the court's sentencing decisions will typically not be reversed on appeal absent a clear abuse of that discretion. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). This deferential standard recognizes that, having observed the proceedings and the defendant firsthand, the trial judge is in a superior position to weigh the relevant sentencing factors. *Id.* The trial court may not, however, consider improper factors in aggravation. *People v. Heider*, 231 Ill. 2d 1, 21 (2008). Such improper factors include an element inherent in an offense (*People v. Harmon*, 2015 IL App (1st) 122345, ¶ 124) and the personal traits of the victim (*People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 17).

¶ 46    The rule against consideration of improper factors should not be applied rigidly, as sentences are intended to vary according with the different facts and circumstances of a particular case. *People v. Williams*, 2019 IL App (1st) 173131, ¶ 24. When a defendant claims a trial court considered an improper factor, the defendant bears the burden of affirmatively establishing that his sentence was based on that factor and must overcome the "strong presumption" that the trial court employed proper legal reasoning. *People v. Musgrave*, 2019 Ill App. (4th) 170106, ¶ 55. In determining whether a trial court relied on improper factors, a reviewing court must focus on the

Nos. 1-18-1602, 1-18-1619, & 1-18-1625 cons.

record as a whole, rather than a few particular words or statements made by the trial court. *Williams*, 2019 IL App (1st) 173131, ¶ 24. The issue presents a question of law, which we review *de novo*. *People v. Reed*, 2018 IL App (1st) 160609, ¶ 54.

¶ 47    Upon reviewing the record as a whole, we find no error in the court's comments. Although the court mentioned that crimes involved a firearm and caused continuing harm to the victims and their families, it is clear that the court was merely reciting the circumstances of the offenses, which is proper. See *People v. Bowden*, 2015 IL App (1st) 132046, ¶ 50 ("The trial court is not required to refrain from any mention of the factors which constitute elements of an offense, and a mere reference to the existence of such a factor is not reversible error."). It is similarly clear that the trial court placed no undue emphasis on the good character of any of the victims. The rule against considering a victim's societal status in aggravation is based on the notion that a defendant whose victim is seen as an asset to their community is not more deserving of punishment than a defendant whose victim is perceived as less worthy. *People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 19. However, a court may rely on the specific harms caused by a crime, such as the impact felt by a deceased victim's family. *Id.* In this case, not only is it evident that the court did not give great weight to the victim's status in society, but the court's mention of Demario's character was only in reference to the victim impact statements from Demario's mother and brother. Victim impact statements may be considered by the trial court to the extent relevant to the particular circumstances of a case. 725 ILCS 120/6(a) (West 2018). Accordingly, we find that the record shows the trial court did not rely on any improper factors in imposing defendant's sentence.

¶ 48                                III. CONCLUSION

¶ 49    For the reasons stated, we affirm the judgment of the circuit court.

¶ 50    Affirmed.

- 17 -